## Case No. 10,539.

### The ONRUST.

[1 Ben. 431.] [1]

District Court, S. D. New York. Oct., 1867. [2]

CHARTER PARTY—CONTRACT TO GO DIRECT — SEIZURE BY MILITARY OFFICER—VIS MAJOR.

1. Where a vessel was chartered in New York to bring a load of cedar from Bayport, Florida, to New York. the charter containing the clause "It is understood that the vessel is now loading for Key West or Tortugas, and is to proceed thence direct to load on this charter," and on her delivery of her outward cargo at the Tortugas, she was seized by the officer in command of Fort Jefferson on the ground that her services were necessary to bring from Key West a supply of coal, for the steam engine by which the fort was supplied with water. and was compelled to perform two voyages to Key West for coal with a file of soldiers on board. and then being released after a detention of fifty days. went at

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]
[2] [Affirmed in Case No. 10,540.]

once to Bayport, where she was loaded by the charterer's agent under a protest that loading the vessel should be no waiver of the charterer's right "to damages by reason of the failure of the schooner to go direct from the Tortugas to Bayport;" and, cedar having fallen in price in the New York market between the time when she would ordinarily have arrived in New York, had there been no detention, and the time of her actual arrival, the charterer libelled the vessel to recover the difference in price caused by such fall in the market, as his damages; *held*, that under that clause in the charter, the owners of the vessel had not agreed to be at the Tortugas or at Bayport at any specified time, and that time therefore was not a specific and essential element in the contract.

2. The meaning of the contract was that the vessel was to proceed without unreasonable delay and by the usual route; and the contract would have been the same if the word "direct" had been left out.

3. Under this charter the master of the vessel was bound to the highest degree of diligence in going from Tortugas to Bayport.

[Cited in The Giulio, 34 Fed. 911.]

4. He was not responsible for delays in that voyage caused by irresistible force.

5. On the facts in this case the master was entirely faithful and diligent, and the vessel was not responsible for any damages occasioned by the enforced delay.

On the 14th of December, 1865, Eberhard Faber chartered the schooner Onrust in New York to bring a load of cedar timber from Bayport, Florida, or some one of several other specified ports adjacent thereto, to New York. At the time the charter-party was signed by the parties, the schooner was in New York, and one clause in the instrument read: "Also, it is understood that the vessel is now loading for Key West or Tortugas, and is to proceed thence direct to load on this charter." In due time, the Onrust left New York and reached Fort Jefferson at the Tortugas, and on the 19th of January, 1866, had discharged her outward cargo of military stores for the fort, and was ready to proceed to Bayport for the purpose of loading under this charter, when she was forcibly seized, by order of the United States military officer, commanding at Fort Jefferson, and sent to Key West for a cargo of coal, on the alleged ground that it was necessary, in order to work the condenser upon which the post mainly relied for drinking water. To secure the enforcement of the order, a sergeant and a file of men were placed on board, and proceeded with the vessel to Key West. She performed the voyage, and brought three hundred tons of coal to the fort, which she discharged on or before the 9th of February, and was again ready to sail for Bayport, when she was again ordered to Key West by the same officer, or by his subordinate, and proceeded under duress to Key West, for another cargo of coal, which she delivered at the fort, whereupon she was released, and on the 11th of March sailed for Bayport. The captain of the Onrust, in both instances, protested against the seizure and enforced services of his vessel and crew. After her arrival at

Bayport, she was loaded by the agent of the libellant, under protest that there should be no waiver of the right of the charterer to damages, "by reason of the failure of the schooner to proceed direct from Tortugas to Bayport." The schooner did not arrive in New York till the 24th of April. Between the 15th of March and the 24th of April, cedar timber fell in the New York market. But for the forcible detention by the military officers at Tortugas, she would, in the ordinary course of navigation, have arrived with her cargo at New York before the fall in the market. Faber thereupon brought this suit in rem for a breach of the charter-party, on the ground that the schooner did not proceed direct from the Tortugas on discharging her outward cargo, but deviated and delayed fifty-one days, and he sought to recover damages in proportion to the decline in the price of cedar timber in the New York market, between the time she would have delivered the cargo there, had there been no delay, and the time she actually delivered it.

G. DeForest Lord, for libellant, argued as follows:

1. The delay at Fort Jefferson was an admitted violation of the terms of the charter, "to proceed direct," &c. It is confessed on all sides that an interruption of the voyage, such as occurred, was against the intention of the contract. The captain's protest at the Tortugas, the conversations between him and the libellant's agents at Bayport, and all the facts of the case, show it to have been fully admitted that the contract, as understood by both the contracting parties, had been broken in this particular. Where the word "directly" is used, it imports more than the legal obligation of speed. Duncan v. Topham, 8 C. B. 225. The language of this charter is therefore wholly inconsistent with an interruption to make two trips to Key West and back.

2. The interruption of the Onrust's voyage, by the action of the United States military officers, affords no excuse for the breach of the charter. Their action was unwarranted, and amounted to a trespass, for which they would be personally liable to the owners of the vessel. The following doctrines, applicable to this case, are clearly laid down in the case of Mitchell v. Harmony (13 How. [54 U. S.] 115): (a) That, although in cases of extreme necessity, military officers may impress private property to the public use, yet it must be under circumstances of immediate and impending danger, which will not admit of delay, or of a resort to the ordinary methods of relief. (b) That the circumstances alleged to create such necessity, must be proved to the court by competent evidence. (c) That even where such necessity is shown to exist, although the officer would no longer be regarded as a trespasser, yet the government would still

be bound to make full compensation at all events.

As to the applicability of that case, it is suggested that the rule which was applied so stringently to acts done in time of active pressing war, will certainly not be relaxed in its application to acts done in a period of actual and perfect peace, when there was not an armed enemy throughout the land. If a seizure would not be justified, for the purpose of carrying out an important military enterprise (which Col. Mitchell's expedition was admitted to have been) very clear proof of a very pressing necessity would be required to sanction an act, which could have been easily avoided by a little foresight on the part of the very officers who made the seizure in this case. No necessity, however great, will excuse a seizure, where there is time and opportunity to meet the emergency by a resort to ordinary means for accomplishing the object. On the facts shown in this case, no such necessity is proved to exist, and the action of the officers was unauthorized.

But even if their action had been authorized, so as to relieve them from the character of trespassers, the government is still bound to make full amends, and the owners of the vessel are the persons, and the only ones, who should, or could obtain, such indemnity. "Private property shall not be taken for public use, without just compensation." Const. Amend. art. 5. "Just compensation" would certainly include all damages for which the owners would be responsible, by reason of this breach of charter. The owners alone could make a claim upon the government. The charterer's only remedy would be upon the contract. Gosling v. Higgins, 1 Camp. 451. The owners might justly claim that the damages caused by the breach of this charter, were the legitimate consequences of the interruption of the voyage. But the charterer could not pretend that there had been any trespass committed upon him. There had been no direct contract between him and the United States authorities, and his only claim would be through the contract with the owners.

3 Assuming that the seizure was unauthorized, and in law a trespass, the owners of the vessel are responsible for damages under their contract. This is an express contract to "go direct," and the rule of law in such cases is laid down as follows: "It is a well settled rule that when the law creates a duty and the party is disabled from performing it, without any default in himself, and has no remedy over, there the law will excuse him. But where the party, by his own contract, creates a duty or charge upon himself, he is bound to make it good, notwithstanding any accident or delay by inevitable necessity, because he might have provided against it by his contract." Harmony v. Bingham, 12 N. Y. 107; Add. Cont. p. 424, 1130.

The authority of this rule rests on innumerable decisions, and is too well settled to be shaken. The dictum of Lord Heath, in Beale v. Thompson, 3 Bos. & P. 427, that the rule did not apply to maritime contracts, because in them the perils of the sea were always excepted (even if it were received as authority), would not create an exception broad enough to cover this case, for the breach here was not caused by a peril of the sea.

Neither does the dictum of Judge Woodruff, in Conger v. Hudson River R. Co., 6 Duer, 375, that "the carriers' duty, to deliver within a reasonable time, is only relative, and they are not responsible for delays occurring without their fault," reach this case, because: (a) That dictum only applies to carriers, and the breach in this case occurred before the owners assumed the character of carriers, which they could not assume till the cargo was placed on board. (b) Judge Woodruff had in view the duty which the law imposes on carriers, and not the responsibility which parties assume for themselves. He was, also, doubtless influenced by the consideration that the risk of collision was one of those ordinary contingencies to which all such contracts are liable, and which might fairly be assumed to have been in the mind of the parties. (c) The breach in the case of the Onrust was not a mere delay in the performance of the contract, but a failure to perform it, for the contract was to "go direct," and that was broken.

The only exceptions to the obligation of the rule above cited, arise when the thing to be done becomes physically impossible, or positively unlawful. Thus, the death of a party, for whose appearance a recognizance has been given, is held an excuse. People v. Manning, 8 Cow. 297. So, also, the death of an animal that has been replevied. Carpenter v. Stevens, 12 Wend. 589. And all the cases in which embargoes have been held to suspend the performance of a contract, may be classed under the second of the above exceptions—the obligation of embargoes being recognized by the law of nations. But the act of the United States authorities in this case, had no legal sanction whatever, and in that respect differed from an embargo.

The act of God, or the interposition even of governmental action, proceeding from a source whose authority is not recognized, is not an excuse in such cases. Shubrick v. Salmond, 3 Burrows, 1637; Sjoerds v. Luscombe, 16 East, 201; Blight v. Page, 3 Bos. & P. 295, note; Gosling v. Higgins, 1 Camp. 451; Evans v. Hutton, 6 Jur. 1042.

The unauthorized act of an officer of our own government would be no better excuse for non-performance, than the above cases of the legitimate acts of unrecognized governments.

4. From these considerations, it seems

clear that the rule first laid down applies to this case, and the breach being unexcused by the facts, the owners are responsible for the damages sustained by the charterer.[3]

R. D. Benedict, for claimants, presented the following points:

1. Assuming that Fort Jefferson was dependent upon coal to supply it with water, and that the ordinary means of procuring coal had proved insufficient, so that on two occasions they had been entirely out of it, the first question for the court is, "Was not the officer in command justified in taking the Onrust to secure a sufficient supply? Or was his act a wrongful one, which made him personally liable in damages?"

The libellant relies upon the case of Mitchell v. Harmony, 13 How. [54 U. S.] 115. But the facts of that case were entirely different from those of the case at bar. There was no question in that case of what was necessary for the support or protection of the army, which is the question here. There is no question here of "insuring the success of an enterprise against a public enemy" yet to be undertaken, which was the only question there. Id. 115. The court in that case held, that assuming the necessity of taking the property for the object in view, viz., "the enterprise undertaken against the enemy," that was not such a necessity as would protect the officer. But it cannot be urged, that with the object in view in this case, viz., the protecting the army from thirst, the necessity of taking property would not be such an one as would protect the officer. It is clear, that in this case there was a "necessity urgent for the public service, such as would not admit of delay, and where the action of the civil authority would be too late in providing the means which the occasion calls for." Id. 134.

2. If the seizure was authorized, the authorized act of an officer of the government is the act of the government, and such an act is a protection to the vessel.

(a) There can be no difference in principle between a seizure of all vessels and a seizure of one. The first is generally spoken of as an embargo, but the word embraces the latter also. "An embargo is commonly understood to be a prohibition of ships sailing, on the breaking out of a war, to hinder their giving any advice to the enemy. But it has a much more extensive signification, as they are not only stopped from the aforementioned motives, but are frequently detained to serve a prince in an expedition. * * * It is certainly comfortable to the law, both of nature and of nations, for a prince in distress to make use of whatever vessels he finds in his ports, that are fit for his purpose." Beaw. Lex Mer. p. 260. See, also, Roccus, notes 10, 65. Now the embargo suspends the performance of contract, leaving the rights of parties untouched. Bouv. Law Dict. word "Embargo"; Hadley v. Clarke, 8 Term R. 259. The reason of this is well stated in Pow. Con. p. 267: "In all cases of contracts and agreements, the parties must be supposed not to have consented, but under a tacit condition that they shall be discharged, if the state throw any obstacle in their way."

(b) A restraint of princes has always been held to be a "casus fortuitus," for which the party restrained is not liable. "Regis et principis facta, inter casus fortuitus enumerantur." 1 Roccus, Ins. note 65. So says the Consulat de la Mer, which provides, that where a ship cannot be loaded as agreed, by reason of restraints of princes, the charterers are not called on to pay any freight, "for it is not their fault if a restraint of princes has arisen, since, against a hindrance by God and by the prince, no one can say anything or make opposition." 2 Consulat de la Mer (Boucher) § 472. Says Valin, speaking of a decision of the royal court of Rennes that a temporary restraint only suspends a charter: "This decision is applicable as well to the case where a ship is arrested in a port where it touches during the voyage, as to the case of her being restrained before sailing, inasmuch as there is no reason for a different rule as to the fate of the charter. In either case, the master and the freighter must wait for the opening of the port and the liberty of the vessel, without any claim for damages on either part." Valin, Comm. tit. 8; approved by 2 Boul. P. Dr. Com. p. 292. So, also, 2 Boul. P. Dr. Com. p. 37: "Every event, every loss, every damage received by goods, which the captain could not foresee, and which it was impossible for him to resist, cannot be considered as occasioned by his fault. Therefore he is not responsible for them."

(c) The reason of this exemption is the same as the reason of the exemption of "perils of the sea." It is, that "vis major" suspends the performance of the contract, by making it an impossibility. "Vis major" is that which cannot be resisted. "Cui resisti non potest." Emerig. Mar. Law, 15, § 2. The same rule applies to loss by pirates. Pickering v. Barklay, 2 Rolle, Abr. 248. The same reason lies at the bottom of the exemption arising from the acts of public enemies. Shall the court hold that the enemies of the ruler have more power than the ruler himself, so that while a seizure effected by a public enemy of the ruler would be a defence to an action, for breach of a contract caused by the seizure, the same seizure, effected by the ruler himself, is no defence? Now the exception of the "perils of the sea" is implied, even though not specified in the contract. Williams v. Grant, 1 Conn. 487;

---

[3] The arguments on both sides on the question of damages are omitted, as the case was decided without reaching that question.

Crosby v. Fitch, 12 Conn. 410. The reason of this is, because of the "vis major," and the same rule should hold of "restraints of princes" for "eadem ratio, idem jus."

3. But it is said that the vessel is not protected, because the exception was not made in the charter, as it might have been. All the cases which bear upon this principle start from the case of Paradine v. Jane, Aleyn, 26, where the language is, "Where the party, by his own contract, creates a duty or a charge upon himself, he is bound to make it good, if he may, notwithstanding any accident by unavoidable necessity, because he might have provided against it by his contract."

Now, there is a distinction to be always kept in mind, in discussing this principle, between maritime contracts and others. The sea is not to be judged by the same rule as the land. It is a different element. It has a law—it has usages and customs of its own; and a rule, in force as to contracts on land, may have no force as to contracts on the sea. Says Judge Heath, in Beale v. Thompson, 3 Bos. & P. 427, in reference to this very rule: "The maxim, cited out of Aleyn, does not apply to marine contracts." That was an action upon shipping articles, in which, if the rule in Aleyn had been applied, the plaintiffs must have recovered. But the court gave judgment for the defendant.

Now a charter, like shipping articles, is a contract peculiar to the sea, and the law of covenants and deeds is not to be too closely applied to it. A bill of lading is a similar contract, as to which, under the cases above cited, the exception of "perils of the sea" applies, though not specified. If the acts of the king's enemies excuse non-performance of a marine contract, though not specified in it, as held in Beale v. Thompson, and the perils of the sea, though not specified, also excuse its non-performance, as held in Williams v. Grant and Crosby v. Fitch, why shall not the "restraints of princes" be equally an excuse, although not specified in the contract? All the old authorities which we have quoted, the Consulat de la Mer, Valin and Boulay-Paty, agree that the excuse is valid, and there is no necessary conflict between them and the maxim in Aleyn, for they all are speaking of marine contracts.

4. But these words of Paradine v. Jane have been, as I think, misconstrued by the subsequent decisions. The facts of the case have not been adverted to; the illustration used by the court has not been considered, and the words "if he may" have been left out of view entirely.

(a) The facts of that case were, that as against an express covenant to pay rent, the defendant set up that by force of armies he had been deprived of the profits of the land—not that he had been prevented from paying. If he had pleaded that, by reason of

the force of armies, the payment could not be made, although he was always willing to pay, would not that have been a defence?

(b) The illustration is, "If a lessee covenant to repair a house, though it be burnt by lightning or thrown down by enemies, yet he ought to repair it." But it is by no means the same thing to say that enemies caused the injury which he agreed to repair, and to say that enemies prevented him from repairing. If the lessee should plead that he was always ready and willing to repair, but enemies prevented, is there anything in the case of Paradine v. Jane, which would hold it to be bad pleading?

(c) Why did the court say, "He is bound to make it good, if he may?" The argument here is, that he is bound to make the agreement good, whether he may or not. Apply the language of the decision to the case at bar, and it would be, "The owners of the Onrust having, by the charter, created this duty or charge upon themselves (to go direct), they are bound to make it good, if they may." But the question in the case is, whether they might or not.

5. The insertion of the word "direct" in the charter, adds nothing to the liability of the vessel. The word "directly" in the case of Duncan v. Topham, cited by the libellant, is used in a different sense from this. The Onrust was bound to go "direct," just as much, whether that was in the charter or not. Fland. Mar. Law, § 208. The duty to go direct was thrown upon her by the law, not assumed by her own contract. Now, it cannot be held, that where a party merely expresses in words the contract which the law throws upon him, he is thereby prevented from availing himself of the exceptions which the law gives him. The rule in Paradine v. Jane does not go so far as that, nor does the case of Harmony v. Bingham, cited by the libellant. In that case there was an agreement by a carrier to carry freight from New York to St. Louis in so many days, and this limitation of time only is what the court refer to. But suppose the defendant in that case had simply agreed in writing to "carry and deliver." That would have been expressly contracting to do a duty which the law threw upon him. Would it be pretended that he could not set up delays by inevitable accident? Nothing in the decision indicates that the court would press the doctrine so far. Besides, that suit was brought to recover $50,000 damages, but the recovery was only $1,158, which plaintiff recovered simply on the ground that by the contract the defendants had agreed to make deductions from the freight at a certain rate, if the goods were not delivered in so many days. The deductions amounted to a greater sum than the freight, which the plaintiff had been compelled to pay to get his goods. But the referee (Judge Bosworth) held that, "as the failure to deliver occurred from causes beyond the control of the de-

fendants, their only liability is a loss of all right to any freight." 1 Duer, 222. And that judgment was sustained. That being the law, how can the vessel in this case be liable for damages?

6. But again, the vessel is not liable for mere delay in performance, caused by this seizure, whether it was authorized or unauthorized. Delay in the performance of a contract is different from a failure to perform it, or such a performance as works injury to the property. "Where the goods are actually delivered, and the complaint is only of a late delivery, the question is simply one of reasonable diligence, and accident or misfortune will excuse the carrier unless he have expressly contracted to deliver the goods within a limited time." Wibert v. Erie R. Co., 12 N. Y. 251. This rule is sustained by numerous authorities. 1 Pars. Cont. p. 659; Ang. Carr. § 289; Parsons v. Hardy, 14 Wend. 217; Hadley v. Clarke, 8 Term R. 259; Constable v. Cloberie, Palmer, 397; Conger v. Hudson River R. Co., 6 Duer, 375. Now, under the facts in this case, the vessel certainly used reasonable diligence. She could have done nothing more than she did.

SHIPMAN, District Judge. The obvious question in this case is, whether the seizure and enforced deviation and delay by the military force at Tortugas, constitutes a breach of the agreement to proceed direct, for which the owners are liable. As there are no exceptions in the charter party under which the deviation can be sheltered or justified, we must look to the general legal import of the contract, and the responsibilities under which it placed the owners of the vessel. The point on which the case turns lies in this clause of the charter party: "Also, it is understood, that the vessel is now loading for Key West or the Tortugas, and is to proceed thence direct to load on this charter." What were the obligations assumed by the owners under this clause of the contract? Clearly, not to be at Tortugas, or Bayport, within any specified time. Time is, therefore, not a specific and essential element in the contract. Of course, if the owners had agreed that their vessel should be at Bayport on or before a specified day, then a failure to comply would have been a breach, for which they would have been liable. No exceptions of perils of the sea, irresistible force, or inevitable accident were inserted in the charter, and none could have been set up to excuse a failure to be at a given port within a time expressly limited by the contract. It is well settled law that even the act of God will not excuse the performance of an express and positive stipulation of a valid contract. School District v. Dauchy, 25 Conn. 530. But the clause of this charter now under consideration is not express as to time. The words, "to proceed thence direct to load on this charter" are not clear and precise when applied to the subject matter—the voyage in question.

"Direct" does not mean in a straight line nor instanter. The language does not measure the exact obligation imposed by the contract. Here the law steps in, and implies that the obligation assumed was to proceed without unreasonable delay and by the usual route. The same legal implication would have sprung from the contract in the absence of the word "direct;" for where the undertaking is to proceed from one port to another, a direct voyage is always prima facie intended. The law implies this, and the legal presumption is conclusive, until rebutted by some custom to deviate or proceed by another route. Lowry v. Russell, 8 Pick. 360. If the word "direct" had, therefore, been left out of this clause, the law would have raised an implied promise to proceed direct from New York to Key West or Tortugas, and thence direct to Bayport or some one of the other ports named. The time, within which such a promise is to be performed, is regulated by law. As the law implies the promise or obligation, so it implies the rule which must govern its performance. No time having been prescribed by the parties, the legal presumption is that they intended a reasonable time.

The case of Duncan v. Topham, 8 C. B. 225, was cited at bar by the libellant. That case held, that where a contract was to be performed "directly," it meant something more than a reasonable time, and that the word "directly" imported "speedily," or, at least, "as soon as practicable." A glance at that case shows that it was very little like the one now under consideration. The subject matter bore no resemblance to the one we are now considering. The contract itself was the result of a correspondence between the parties, and, when expounded with reference to the subject matter, clearly presented a limitation as to time. But if we apply the doctrine of that case to the one now before us, we shall construe the clause of this charter to be an agreement of the owners of the Onrust that she shall proceed from New York to Key West or Tortugas, in a reasonable time, and from thence as soon as practicable, or speedily, to load on this charter. Still we have no express stipulation, by which time is made an essential element in the contract. We must resort to the rules of law for the measure of the obligation assumed. From New York to Key West or Tortugas reasonable diligence is required in expediting the voyage by the direct route, and from Tortugas to load on this charter, the highest degree of diligence. It is hardly necessary to cite authorities to show, that where a party is bound to the exercise of even the highest degree of diligence, he is not responsible for delay, caused by the interposition of irresistible force, where that force confronts and overpowers him without any fault of his own. "By irresistible force is meant such an interposition of human agency, as

is, from its nature and power, absolutely uncontrollable." Story, Bailm. 25. For delay caused by such a force, a ship bound to proceed on her voyage with any the highest degree of diligence, is no more responsible than she would be for delay caused by lightning or the gale. The most extraordinary diligence cannot go beyond the most exacting fidelity and care in the performance of duty. When these are exhausted in the execution of a contract, where no time is expressly prescribed, the obligations of the party, upon whom the duty rests, are discharged. In the present case the master of the Onrust was entirely faithful and diligent. He not only refused to charter his vessel to the military officers at Tortugas for the purpose of transporting the coal, but he formally protested against the seizure of his vessel, and submitted only to an overpowering force. For this enforced detention, whether lawful or unlawful, the vessel is no more responsible than she would have been if the same delay had resulted from her being driven out of her course by a storm which she could not resist. It follows, therefore, that, as the contract only bound the owners to prosecute the voyage with diligence, and that diligence was exercised, the delay caused by military force constituted no breach.

In view of this conclusion it is hardly necessary to dwell on the cases cited by the libellant, to show that a party may be responsible for the non-performance of a contract, where his failure has been caused by the interposition of illegal force. I will, however, notice one, for the purpose of suggesting in the same connection the distinction which separates that class of cases from the one now before us. Gosling v. Higgins, 1 Camp. 451, was an action for the non-delivery of ten pipes of wine, shipped at the Island of Madeira, on board of a vessel of which the defendant was owner, to be carried to Jamaica, and from thence to England. When the vessel arrived off Jamaica, she was seized, with her cargo, for a supposed violation of the revenue laws, and there condemned; but, upon appeal to the privy council in England, the sentence of condemnation was reversed. A verdict for the plaintiff was ordered by Lord Ellenborough, who remarked to the defendant's counsel, "You have an action against the officers. The shipper can only look to the owner or master of the ship." Here it will be seen was a breach of an express and essential stipulation in the bill of lading, which was to deliver the wine in England. No delivery was ever made. In other words, there was no performance. But the present controversy does not arise out of the breach of any express stipulation. The voyage was performed and the cargo delivered. The only pretended breach consists in not proceeding from Tortugas to Bayport in proper time. But no particular time was

stipulated in the contract, and the only time to which the vessel was bound, was that implied by law from the use of the word "direct," which, under the strictest construction, can only mean that period necessary, in the use of the highest diligence, under all the circumstances, to accomplish the voyage. The distinction is obvious. In one case, there was a breach of an express stipulation in the contract. In the other, the time of performance was prolonged by no fault of the master, but, as time was not made the essence of the contract, enforced delay was no breach.

It is obvious that the claim of the libellant would stand upon no higher ground if the word "direct" were held to apply primarily to the route, rather than the time of the voyage from Tortugas to Bayport. The word, applied to either aspect of the case, would be governed by the same rules of law. But, in fact, the gravamen of the libellant's complaint, is not that the Onrust did not pursue the customary route from Tortugas to Bayport, but that she did not start from the former port at the time she ought.

Let a decree be entered dismissing the libel with costs.

[On appeal to the circuit court, the decree of this court was affirmed. Case No. 10,540.]