## THE GIULIO.[1]

### PAOLILLO *v.* ONE THOUSAND NINE HUNDRED AND FORTY BALES OF VEGETABLE HAIR.

### CORMACK *et al. v.* THE GIULIO.

*(District Court, S. D. New York.* April 30, 1888.)

1. SHIPPING—CARRIAGE OF GOODS—UNREASONABLE DELAY.

A vessel chartered to the Mediterranean and back to New York, put into her home port in Italy on account of stress of weather. Some repairs were put on her there, and, after their completion, she was detained three weeks longer, through acute rheumatism of the master. *Held*, that the owner was not justified in detaining the vessel in her home port for such reason, without indemnifying the charterer for the expense and loss caused by the delay.

2. SAME.

A vessel is liable for the fall in market prices during a period of negligent delay on her part, though such delay arose before the cargo was shipped, when the delay was voluntary, and was in the course of the voyage contracted for by the charter, and after it had been entered upon.

3. SAME—WAIVER.

Charterers who load a vessel with return cargo after a period of negligent delay on the part of the vessel do not thereby necessarily waive the right of action which has already accrued to them for the breach of the ship's legal duty of dispatch in fulfilling the charter requirements.

4. SAME.

Where objection that a vessel has not taken a full cargo is not made at the time when objections in other respects are made by protest, any complaint made afterwards on this score should be looked upon with suspicion.

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

**5. SAME—LIEN FOR FREIGHT.**
        Unqualified delivery of cargo to consignee without notice of intent to retain
the lien for freight is a waiver of such lien; but a delivery of cargo to a wharf-
inger or warehouseman on the consignee's account, accompanied by a notice
of lien for freight, is no waiver, and the lien continues.  Even if the notice of
lien is served an hour or two after the last of the cargo is delivered, so slight
a delay as the fraction of a day in serving notice should not necessarily be
deemed indicative of any intent to make an unconditional delivery.

**6. SAME—DEMURRAGE—CUSTOMARY DISPATCH.**
        A vessel's arrival was reported to charterers on the 6th of February.  On
the 7th they directed her to a wharf, which she reached the same day, but
other vessels in the slip prevented her beginning to discharge until the 14th.
She was discharged, without unusual exertion, in four days.  No reason was
given for sending the vessel to a wharf where she was detained so long.  The
charter called for "customary dispatch."  There was no strict proof of what
was customary dispatch for such cargo as the vessel had.  *Held*, that the ship
was entitled to five days' demurrage.

   In Admiralty.

   The above are cross-libels arising upon a charter party of the Giulio to
H. M. Cormack and others, dealing under the name of Latassa & Co.   In
the second action damages are claimed for the delay of the Giulio in pro-
ceeding to her destination, and for not taking on board a full cargo; in
the first, freight was claimed for the cargo delivered.   The vessel was .
chartered on May 13, 1886, for a voyage from New York to Gibraltar
and Malta, and thence for return cargo back to New York, from either
Bona or Oran, for a lump sum of £600 sterling.  She arrived at Malta
September 14th, where she completed her discharge on the 28th of Sep-
tember.   By cable directions from the charterers she was ordered to Oran,
a port on the north coast of Africa.   The vessel left Malta on the 4th of
October, and from the 8th to the 9th, meeting heavy weather, according
to the master's testimony, she was obliged to put into Castellamare, her
home port, which she reached on October 10th.   During the next three
weeks considerable repairs were made to her there, and, after the repairs
were completed, she remained three weeks longer, in consequence of the
illness of the master with acute rheumatism.   She left on the 23d of No-
vember, and arrived at Oran in the extraordinarily short time of eight
days.   The passage is sometimes from 30 to 40 days.   During all this
time Latassa & Co. had a cargo in waiting at Oran, and were under ex-
penses for storage, insurance, etc., for which damages were claimed, as
well as for loss through the fall of the market price upon late delivery in
New York.   The charterers claimed that the lien on the goods for freight
was lost by unconditional delivery of the goods.   The vessel claimed also
five days' demurrage.
   *Wing, Shoudy & Putnam*, for Paolillo.
   *Whitehead, Parker & Dexter*, for Cormack.

   BROWN, J.   1. The evidence is not sufficient to impeach the state-
ments in either of the three logs which, by the Italian law, it was the
duty of the master of the bark Giulio to keep.   Their purposes being
different, greater fullness of detail in log No. 1 as respects the gale en-
countered on the 9th of October than was entered in log No. 2 was proper.

That the additional matter is not found repeated in log No. 2 casts no discredit upon log No. 1. The other evidence shows that the night was [*burrascoso*] squally and boisterous. I cannot find, therefore, that the master was not justified in putting in at Castellamare, or overrule his judgment of the necessity of putting into port. *The Maria Luigia*, 24 Blatchf. 15, 28 Fed. Rep. 244; *Insurance Co.* v. *Catlett*, 12 Wheat. 383; *Fearing* v. *Cheeseman*, 3 Cliff. 91.

2. After necessary repairs were completed at Castellamare, the vessel was kept there some three weeks longer, through acute rheumatism of the master. That port was her home port; and, under her duty, according to the terms of the charter, and the charterer's instructions, to proceed to Oran, I do not think the owner was justified in further detaining the ship in her home port on account of the master's illness, after the repairs were completed, and after the long delay already incurred, without indemnifying the charterer for the expense and loss caused by the additional delay. The master should have gone aboard, and, with the aid of the mate and other officers of the ship, as in ordinary cases of illness at sea, proceeded to Oran; or, if that were not practicable under the circumstances, it was competent for the owners to appoint another master, either for the rest of the voyage, or temporarily. The ship owes the charterer diligence and dispatch. *The Success*, 7 Blatchf. 551; *The Onrust*, 1 Ben. 431. The expense of that delay, namely, the storage and other expenses of the cargo during this time, should therefore be paid by the ship to the charterer.

3. In addition to the local expenses of storage, Latassa & Co. are, I think, entitled to the amount of the fall in the market price, if there was any fall, during the three weeks preceding the date of arrival in New York. The liability of the vessel for the loss of a market during the period of negligent delay, after the goods have been taken on board, has been often decided in the courts of this country. *The Success, supra; The City of Dublin*, 1 Ben. 46; *The Golden Rule*, 9 Fed. Rep. 334; *Page* v. *Munro*, 1 Holmes, 233; Desty, Shipp. & Adm. § 256. I see no reason why the same rule should not be applied, though the delay arose before the cargo was shipped, where the delay was voluntary, and arose in the course of the voyage contracted by the charter, and after it had been entered upon. The charterers assuredly had the right to count upon the ship's proceeding to Oran, pursuant to orders, with reasonable dispatch, as it was her duty to do. No notice was given to them of her inability to proceed, nor was there any proposal to give up the performance of the rest of the voyage. The charterers were in daily expectation of her arrival at Oran; and, so far as her delay in leaving Castellamare arose from the fault of the owners, there is no reason why the consequent loss should be borne by the charterers. Their loading her with a return cargo when she did arrive at Oran was no waiver of their right of action which had already accrued to them for the breach of the ship's legal duty of dispatch in fulfilling her charter engagements. The case of *The Parana*, 2 Prob. Div. 118, and of *Olhsen* v. *Drummond*, 2 Chit. 705, do not seem to me applicable here. The period of unjustifiable delay, as I find from

the proofs, is three weeks. The bark is not entitled to offset against this her quick run of 8 days. There is no knowing but that she might have made the same run had she left Castellamare when she ought to have left. Having delayed unjustifiably three weeks at Castellamare, the contingencies of navigation cannot be taken into account. She must answer as for three weeks' expenses of the cargo at Oran, and for the fall in the market price of the cargo, if there was any fall, during the three weeks before the bark arrived in New York.

4. The evidence does not show that the bark did not take a full cargo. All was taken that was tendered at Oran, and the protest made by the charterer's agent at that time and place, though objecting to the previous delay, makes no complaint of her not taking a full cargo. The master says she was full, and the stevedore so certifies. The cargo was of the lightest character. Much was necessarily left to the judgment of the master in regard to the quantity of ballast necessary; and, no objections being made at the time when objections in other respects were made by protest, any complaint made afterwards on this score would be justly looked upon with great suspicion, even if evidence had been offered to sustain it.

5. By the law of this country the vessel has a lien upon the cargo for freight. This lien may be displaced by contract, or it may be waived. *The Eddy*, 5 Wall. 481, 494. An unqualified delivery of the cargo to the consignee without notice of any intent to retain the lien, is deemed a waiver. *Bags of Linseed*, 1 Black, 108; *A Cargo of Brimstone*, 8 Ben. 45; *Wilcox* v. *Tons of Coal*, 14 Fed. Rep. 49. But a delivery to a wharfinger or a warehouseman on the consignee's account, accompanied by a notice of lien, is no waiver, and the lien continues. In this case the evidence shows that the delivery to the warehouse directed by the consignee was completed about noon of the 17th; and that on the same day, about noon, a written notice of the ship's lien upon the cargo was served on the warehouseman. It is clear that there was no intent to make an unconditional delivery of the cargo; the contrary intent seems to me manifest. Even if the actual service of the notice were an hour or two after the last bale was delivered on the 17th,—which the evidence, however, does not show,—so slight a delay as the mere fraction of a day in serving notice could not justly be deemed as indicative of any intent to make an unconditional delivery; and the situation of the consignee, of the warehouseman, and of the goods, being unchanged, no waiver of the lien can be found. *Bags of Linseed*, 1 Black, 108.

6. The charter stipulated for customary dispatch in unloading at New York. There is no strict proof of what is customary dispatch for such a cargo. The treasury regulations of 1884, p. 92, art. 185, prescribe that if vessels of between 300 and 800 tons are not discharged in 12 working days, the custom-house officers may take possession. The purpose of this regulation is so different from that of the charter requiring unloading with customary dispatch, that the period of 12 days, for vessels of so different capacities, and without reference to the kind of cargoes, is no criterion of what is "customary dispatch" as between the par-

ties to a charter. The arrival was reported to the charterers on Febru-ary 5th. The charterers, on the 7th, directed the bark to a wharf, which she reached on the same day; but other vessels in the slip prevented her beginning to discharge until Monday, the 14th. She was then discharged, and the discharge was completed about noon of the 17th. No reason is given for sending the vessel to a wharf where she was detained so long before she could commence discharging. Twenty-four hours after that, in addition to the two days after notice of arrival, were certainly a reasonable and sufficient time, in the absence of further proof, to find a dock and berth where the ship might commence her discharge. It does not appear that the discharge in four days after she began was through any unusual exertions. Four days' time must therefore be taken as a reasonable time for the actual discharge of this cargo. This leaves five days for which the vessel is entitled to demurrage. There must be a decree, therefore, in favor of the libelant in the first-named cause for the freight and for demurrage for five days, with interest and costs; and a decree in favor of the libelants in the second cause for the expense of storage of the cargo at Oran, with insurance, for three weeks, and for any fall in the market price during three weeks before its arrival, with interest and costs; the latter decree to be offset against the former, and the stipulators on either side to be held only for the difference.