## LUTZ ET AL., Libellants,

*v.*

## SCHOONER "D. J. SAWYER" ET AL., Claimants and Respts.

---

San Juan, Admiralty, No. 952.

### DAMAGES FOR BREACH OF CHARTER PARTY.

Admiralty—Pleadings—Amendment.

    1. It is not error to allow libellant to amend libel by adding an additional party plaintiff and then seek to show by proof that, although the transaction was nominally by the original plaintiff, it is for the benefit of the new plaintiff also, inasmuch as the two were partners.

Admiralty—Depositions.

    2. It is not necessary to give notice to the adverse party of the filing of a deposition.

VIII. Porto Rico—33.

Lutz v. The "D. J. Sawyer."

Admiralty—Charter Party—Rescission.

3. Evidence *held* not to prove a parol agreement for suspension of charter party upon a certain contingency, nor an actual rescission by the parties.

Admiralty—Charter Party.

4. Evidence *held* to show that freight needed to comply with charter party was furnished.

Admiralty—Charter Party—Breach—Damages.

5. Libellant is entitled to recover whatever damages directly grew out of claimant's not sending chartered vessel back for second cargo in accordance with charter party; this includes demurrage on lighters held overtime waiting to load vessel, interest on the cargo purchased for second trip, and loss occasioned by having to provide larger amount of freight to vessel secured as substitute.

Admiralty—Charter Party—Breach—Damages.

6. Libellant cannot recover despatch money he claims would have been earned on the voyage, as the same is speculative.

Admiralty—Charter Party—Breach—Damages.

7. Libellant is entitled to interest on damages at legal rate at place where contract was to be performed, from date on which breach took place, which is to be taken as the date on which vessel should have arrived at loading point.

Opinion filed April 4, 1916.

---

## Statement of Facts.

This libel was filed November 25, 1914, and answered January 20, 1915. It came on for trial at Mayaguez in January, 1916. At the trial sundry amendments were made, whereby Diaz as party plaintiff was added, and appropriate amendment made in the answer to meet the amendment of the libel. The libel is against the schooner "D. J. Sawyer" at Mayaguez, Porto Rico, her tackle, etc., and against P. Lopez, and all persons intervening for their interest, in a cause of contract, civil and

maritime, and sets up that the libellants are residents of Pensacola, Lopez, the agent of the schooner, a resident of Mayaguez, and the schooner "Sawyer" is of Mayaguez. That on March 30, 1914, Lopez as agent chartered the vessel to the libellant E. Lutz for four voyages from Tampa or other Gulf port to any port of Haiti, San Domingo, San Juan, Mayaguez, Aguadilla, and Ponce, the first voyage to be not before May 25, 1914, and to be ready for the last on December 1, 1914. The usual provisions were inserted in the charter party as to the condition of the vessel, merchandise to be loaded, and room for the cargo. "The said party of the second part doth engage to furnish to the said vessel a full and complete cargo under and upon decks of 290,000 feet as minimum freight on dressed lumber to be paid as actual measure. The said party of the second part agrees to pay to the said party of the first part or agent for the charter or freight of said vessel, as follows: on the first voyage at $7.25, second voyage at $7⅜, the third voyage $8.25, and the fourth voyage at $7.50 per thousand superficial feet delivered. Freight payable on proper delivery of cargo at port of discharge, in American gold or its equivalent, without discount or commission." Then follow the usual provisions of charter parties. It is provided that "if charterers have the privilege of more than one port for loading, the orders of such loading port are to be given by the charterers to the captain after he asks so five days before being ready to sail." There is the usual exception of act of God, etc., "or any occurrence beyond the control of either party, and all damages, delays, and accidents of the seas, rivers, railroads, and navigation of whatsoever nature and kind, always mutually excepted." A letter annexed as part of the charter provides that "if for force mayor a captain

would not receive advice of the port he should go to, he will leave for Fort Morgan f. o. b. and considering this as one lay day. . . . The second part will guarantee to the first part 290,000 feet as stated on this contract; but it is understood vessel to load on deck about the same quantity as she averaged loaded on the last five voyages." The libellant alleges that the libellant furnished 297,109 feet of lumber, more or less, at St. Andrews, and the schooner set sail for San Juan, where cargo was discharged, and on August 6, 1914, libellant was requested by cable to issue orders for the next loading port, and that on the 11th libellant by cable ordered the schooner to St. Andrews, where he proceeded to prepare the cargo. That September 25, libellant received a cable, unsigned, advising him not to expect the schooner, and she never arrived. That the schooner was, upon the determination of the first voyage, rechartered to someone else, to libellant's damage of $6,900.

The answer, after admitting residences and chartering, alleges that a verbal agreement was added to the charter party, whereby it was stipulated, in case of difference or shortage on account of wrong specifications as to amount of lumber, the charter contract was to cease until a proper settlement. That a cargo was furnished for the first voyage, consisting of 361,558 feet of dressed and rough lumber. It admits that Lopez requested orders for the next loading port, and that orders were received to proceed to St. Andrews, but this was before Lopez or the claimant knew of the great difference in the "talling" of the lumber shipped, amounting to 64,449 feet of lumber. It admits that a cable was sent September 25 not to expect the schooner. That after learning the difference in the cargo, claimant on the 8th of August claimed it from libellant, but it was

never settled. That the schooner remained in the port of San Juan until the latter part of September under the verbal addendum to the charter party. That on September 22 libellant at Mayaguez instructed the respondent's manager that he was not willing to pay the difference, and instructed him to inform the respondent to cancel the charter party, which respondent accepted.

On the trial it was moved to suppress the deposition of Diaz, because no notice had been given of its filing. This was refused, and the deposition, together with documentary and other evidence, was considered. The facts, so far as they are disputed, are considered in the opinion.

*Mr. J. R. F. Savage* proctor for libellant.

*Mr. E. Ramirez Nadal* proctor for claimant.

HAMILTON, Judge, delivered the following opinion:

This case involves questions of fact rather than law, and some preliminary questions as to the capacity of the plaintiffs to sue will be first considered.

1. Considerable change was made in the case by the amendments allowed at the hearing, whereby one Diaz was admitted as a party plaintiff. It is contended on behalf of the defendant that the evidence does not show Diaz had anything to do with the transactions involved in this suit, that the charter was made entirely to plaintiff Lutz, while the evidence shows the damages claimed were suffered by Diaz. Under the Porto Rico practice a partnership may in some cases sue as an entity

Lutz v. The "D. J. Sawyer."

distinct from the individuals composing it, and if this were a suit at common law the view urged by the defendants would have more merit than in a suit *in personam* in admiralty by the parties making up a firm. It is not an entire change of parties to add a name of another plaintiff and then seek to show by proof that, although the transaction was nominally by the original plaintiff, it is for the benefit also of the new plaintiff, inasmuch as the two were partners. This is not unlike the well-known principle of law that a principal can take advantage of a contract made for his benefit by an agent, although he was not known in the transaction itself. It might well be that equities might exist between the original parties which the principal, or, in this case, an additional plaintiff, would not be permitted to disturb; but there is nothing of that kind involved at present. There was no error in allowing the amendment. While, perhaps, not as conclusive as some other points in the case, it seems to be shown by a preponderance of the evidence that the new plaintiff was interested in the entire transaction, and that the original plaintiff also was to share in the profits and losses under consideration.

2. It seems to be true that the deposition of Diaz was filed without any notice being given to the defendants. No rule of this court, however, requires notice to be given of the return of depositions. Rule 14 merely provides for the opening of depositions. Nor is it perceived that any right of a party is violated by there not being such a rule. Any objection to the deposition as a whole can still be taken before entering on the trial, and any proper objection to special parts of the testimony can be taken when the deposition is offered. In point of fact, the deposition was filed in court some time

Lutz v. The "D. J. Sawyer."

before the trial, and both sides had or could have had access to it.

3. If there was a rescission of the charter party, as claimed by the defendants, there could be no damages recoverable in this case. The court is not at all satisfied that there was such a verbal addition, however, to the charter party. The charter party is made up of an original blank, a letter annexed, and a pencil memorandum on the original blank. It would seem that the whole contract, therefore, was reduced to writing, and the evidence is not at all convincing that there was the verbal addition claimed. On its face it would seem extremely improbable that there would be an addition to the effect that the carrying out of the charter party should remain in suspense whenever the parties differed as to the quantity of lumber involved. This difference might be very small, and, indeed, in the case at bar was under $200, while the damages resulting from delay might, on one side or the other, amount to many thousand dollars before the matter could be adjusted. And the same is true of the alleged cancelation by Lutz of the charter party. It is distinctly denied by him, and the evidence of Amy is not convincing. In a rapid-fire discussion growing out of differences, words might readily be misunderstood. On the whole, the court considers that there was no agreement for cancelation and no actual cancelation proved in this respect. The case will thus be decided upon its merits. Lopez's letter of August 8, 1914, was written after the discovery of the alleged shortage and says nothing about holding the vessel, whether under the contract or independently, until the shortage was adjusted. On the contrary, it distinctly advises Lutz that "the schooner D. J. Sawyer has finished

Lutz v. The "D. J. Sawyer."

discharging at San Juan and is awaiting your instructions as to the port to which she should proceed. . . . I beg that you would examine your notes again, and hope that you will credit me with the difference which has, not been paid." This is not the language of a man who is holding a vessel until the difference shall be paid, and it is highly improbable that he would hold the vessel even three weeks, at $30 a day, to insure the payment of less than $200 difference due him. The conclusion, therefore, is that the libellant did not fail to comply with his part of the contract in this regard.

4. The testimony satisfies the court that according to the mill specifications there were laden on board 187,858 feet of dressed lumber and 173,700 feet of rough lumber. The figure for dressed lumber, however, represented the mill measurement of the lumber in its rough or undressed state. The actual measurement of this dressed lumber was less, say 123,409 feet. Adding this to the figure for the undressed lumber of the cargo gives 297,109 feet as the proper figure upon which to pay freight. The charter party itself provides for payment of freight on the dressed lumber at its actual measure. There was some conflict in the testimony on this point, but the preponderance of the evidence is as stated above. The result, therefore, is that the lumber shipped is substantially what is called for in the charter party and other papers in the case.

5. The libellant having therefore made out his case, the only question remaining is as to the amount of damages. Whatever directly grows out of claimant's not sending the Sawyer back for the second cargo should be charged up as damages, because it would be damage directly flowing from the breach of the contract. The Giulio, 34 Fed. 909, 911; Wheelwright

v. Walsh, 44 Fed. 380, 382. The difficulty is to estimate precisely what comes under this admitted head.

The libellant claims seven items, amounting in all to $4,152.62, as damages. Of these, demurrage on the lighters held overtime waiting for the Sawyer would seem to be proper charges against her and her owners. This amounts to $2,520.

Interest on the value of the lumber purchased for the second voyage of the Sawyer and held for three and a half months would also be a proper charge. The value of the lumber is shown to have been $5,000, and the rate of interest at the time 8 per cent. This item, therefore, amounts to $116.66.

Libellant also claims $498.44 damages as loss on 249,220 feet of lumber shipped to complete the cargo of the Annie, the substitute vessel. It seems to refer to lumber which was put in. The theory of this item is that if libellant had not put this lumber in he would have had to pay dead freight on the space not occupied, and therefore he was entitled, in reduction of this damage against him, and through him the Sawyer, to fill the space with lumber, and charge the boat with what he lost upon the lumber thus filled in. The principle of substituted damages is well known. Wheelwright v. Walsh, 44 Fed. 381. It would apply under the circumstances at bar, where the substituted vessel required more cargo than the original vessel. This seems to have been the case in the present instance, and so the item, which has been otherwise proved, is correct, and it will be allowed. But if this is so, there cannot be an allowance for loss on lumber "shut out," as claimed in another item. One or the other of these claims must be incorrect, and it would seem to be the one as to the lumber shut out, inasmuch as the second vessel, the Annie, was the larger of the two.

Lutz v. The "D. J. Sawyer."

6. There are other items, however, which either do not grow out of the breach of the contract, or, at least, are not shown to grow out of it. For instance, the charge for seven days' despatch money, which libellant claims would, from his experience with the first voyage, have been earned upon the second voyage of the Sawyer, is speculative. Conditions might or might not have turned out to be the same upon the second trip. This despatch money was to have been saved from the freight of the second voyage, and not from the freight of the first voyage. This item is not allowed. In the same class would come the allowance of $800 on the shipment to Finlay, Waymouth, & Lee. This was an allowance of $800 on uninvoiced blind slats sent upon other vessels, the Margaret B. Rouss and the Goldfield. Libellant Lutz writes that firm that "in consideration of the large shipments per above schooners, of which you have no use whatever at present for the parcel-cargo per Goldfield, I allow you" these above refunds. This may have been a proper refund to Finlay, Waymouth, & Lee, but it is not clear how it grows out of the breach of the charter party in question in this suit. It would seem that libellant sent too much lumber at a time for the San Juan market, but it is not shown how the same result would not have followed if he had been using the Sawyer. *Non constat* he would have suffered the same loss in either case. This item, therefore, cannot be allowed.

7. The four items allowed amount to $3,135.10, and they must date as of the breach of the charter party. That was certainly a fact by the 25th of September, 1914, but the charter would seem to have been broken August 11, 1914, when the libellant cabled for the Sawyer to go to St. Andrews and she did not do so. The testimony, however, is that it would take

about two weeks for her to get to St. Andrews from San Juan, so that it would probably be right to make the breach of the charter date from the time when she should have arrived to take on the cargo. This can be fixed approximately as August 25, 1914. From that date interest should run upon the above amount, except the amount of $116.66, upon which no interest will be allowed. The rate of interest would be that prevalent where the contract was to be performed. It is true that the vessel was to be on the ocean rather than at either end of the line, but the damages to the libellant were incurred in Florida. It was there the vessel should have been, and there she did not arrive. In a sense the contract was broken in Porto Rico, but its effects in the shape of damages are what at present concern us. In such a case it is not the price of the powder and ball discharged from a pistol that is in controversy, but the injury to a person at a distance caused by the discharge. The interest on the damages is incident to the damages themselves, and must be calculated at the rate prevalent where the damages are suffered. Therefore, the rate of interest prevalent in Florida would be the rate controlling in this case, and the legal rate in Florida is shown to have been 8 per cent. The fact that it was difficult to get money at that rate on account of the failure of a bank cannot be taken into account. The libellant could not legally have been made to pay more than 8 per cent, and he therefore could not legally exact more than 8 per cent.

A decree will therefore be entered for the above amount, with interest at 8 per cent from August 25, 1914, and costs.

It is so ordered.