BUSSEY v. MEMPHIS & LITTLE ROCK R. CO.

*(Circuit Court, E. D. Arkansas. April Term, 1882.)*

1. RAILROAD COMPANIES—AS CARRIERS.

A railroad company is not bound to undertake the carriage of goods beyond the terminus of its road; but if it does enter into a contract to do so, it is bound by it, and is under the same obligation to furnish means of conveyance beyond the line of its own road as it is upon it.

2. SAME—WHEN MAY REFUSE FREIGHT—DUTY OF.

A railroad company may rightfully decline to receive freight offered, when it has not the requisite rolling stock and equipments to carry it without delay; but if it receives goods for transportation, it cannot escape responsibility for delay by a previous accumulation of freight at its depots by acquainting the shipper, when he offers goods for carriage, with the facts, and affording him the option of acquiescing in the delay or seeking some other line of transportation.

3. SAME—CONNECTING LINES—THROUGH BILLS OF LADING—DELAY IN TRANSPORTATION.

Through bills of lading impose on the railroad company, as carrier, the obligation to provide means of transportation for the goods shipped to their ultimate destination without delay, and it is no excuse for the non-performance of this duty that it could not procure transportation by boat by reason of a previous accumulation of freight, of which it was advised when it received the goods for transportation.

4. SAME—MEASURE OF DAMAGES—FOR DELAY.

The measure of damages for delay by a carrier in the transportion and delivery of goods at their point of destination, is the difference in the market value of the goods at such destination on the day they ought to have been delivered, and the market value on the day they were delivered.

*W. G. Whipple*, for plaintiff.

*B. C. Brown*, for defendant.

CALDWELL, D. J. Between the seventh and the twenty-fifth of November, 1878, the plaintiff's agent delivered to the defendant company at Little Rock, and other stations in that vicinity, 602 bales of cotton for shipment, consigned to the plaintiff at New Orleans. The bills of lading specify and guaranty a through rate of freight to New Orleans, and are indorsed in ink "via river from Hopefield," and are identical in every respect, except that some declare the cotton is received "to be transported from Little Rock, Arkansas, to New Orleans, Louisiana, and delivered to the consignee, or a connecting common carrier," while in others "Hopefield, Arkansas," is inserted in lieu of "New Orleans, Louisana," where those words occur in the above extract. The plaintiff having shown an unreasonable delay in delivering the cotton, the burden is cast on the defendant to show some fact which will justify or excuse that delay. This the answer at-

tempts to do by stating that a quarantine, established to prevent the spread of yellow fever, stopped the defendant's road from running from the fourteenth of August to the twenty-eighth of October, and that owing to this fact at the time plaintiff's cotton was received "large quantities of freight had accumulated at Little Rock and other depots upon its line for transportation to Hopefield, and other large quantities had accumulated in the country, and was afterwards delivered for transportation, and that owing to such accumulation it could not forward said cotton upon the day of its reception, but that it did carry said cotton to Hopefield as soon as it could do so under the circumstances." And, touching any delay at Hopefield, the answer states that previous to the receipt of the cotton a quarantine had been in force along the Mississippi river, which prevented boats from navigating that river between Cairo and New Orleans, and that during the existence of the quarantine "large quantities of freight accumulated on the banks of the river for transportation to New Orleans, and boats coming down the river to Hopefield came laden to their utmost capacity, and could take no more freight; and said cotton was forwarded from Hopefield by the very first boat that could take it." These statements in the answer accord with the facts in the case and are fatal to the defense.

A railroad company is not bound to undertake the carriage of goods beyond the terminus of its road, but if it does enter into a contract to do so it is bound by it, and is under the same obligation to furnish means of conveyance beyond the line of its own road that it is upon it. And a railroad company which has the requisite rolling stock and equipments to carry without delay, the freights usually offered, is not bound to receive goods which it is not at the time able to carry, by reason of some accidental or extraordinary increase in the public demand for transportation, occurring without the fault of the company. In such case the company may rightfully decline to receive freights offered, and which it cannot carry without delay. But if it does receive the goods, it can only relieve itself from responsibility for delay in carrying them, resulting from a previous accumulation of freight at its depots for transportation, by acquainting the shipper with the facts when he offers his goods for carriage, and affording him the option of acquiescing in the delay, or seeking some other line of transportation for his goods. There were other lines open to the plaintiff, and his agent testifies that he would have shipped the cotton by some other line had he not been advised that it would go forward over defendant's line without delay. The through bills of

lading undoubtedly imposed on the company the obligation to provide means of transportation for the cotton from Hopefield to New Orleans without delay. Its engagement to deliver the cotton in New Orleans bound it to furnish the means of carriage for that purpose. Under such a contract it had no right to rely on boats casually navigating the river. And the carriage must have been continuous, and without delay, except the delay usually incident to transferring freight from the cars to the boat at Hopefield. If the cotton was detained an unusual length of time at Hopefield, the defendant cannot escape responsibility for such delay on the plea that no boats offered to take it. The obligation rested on the defendant to furnish boats to transport it, and it is no excuse for the non-performance of this duty that it could not procure transportation by boat by reason of a previous accumulation of freight, of which it was advised when it received the cotton.

On the face of the through bills of lading, therefore, it was the legal duty of the defendant, on the arrival of the cotton at Hopefield to ship it thence by boat to New Orleans without delay, and to provide boats for that purpose. The company had no right to trust to adventitious aid to carry out its contract, and if it did so and was disappointed, the plaintiff is not to be made to suffer thereby.

As to the Hopefield bills of lading it may be observed: (1) That the difference in the bills of lading seems not to have been regarded as of any moment by the parties; they were issued by the company and received by the shipper indifferently, as meaning the same thing, and as having the same legal effect; (2) the plaintiff's agent testifies distinctly that the company's agent assured him the cotton would be shipped through to New Orleans without delay, and the cotton was delivered to the defendant on the faith of such assurance; (3) all the bills of lading fixed and guarantied a through rate of freight to New Orleans, which precluded the shipper from making a contract with any other carrier to carry the cotton from Hopefield.

The defendant had a right to obtain the best freight rates it could for carrying the cotton from Hopefield to New Orleans, but it could not hold the cotton to obtain favorable rates, and in order that it might make more money out of its contract with the plaintiff, as the plaintiff contends was done. Upon the facts in the case all the bills of lading should probably be treated as the parties treated them at the time—as through bills of lading, and imposing obligations on the company accordingly. But whether this is a sound view or not need not be determined. Nor is it necessary to decide what the legal effects

of the Hopefield bills of lading would be taken by themselves, and disconnected with the other facts in the case. On the pleadings and proofs the defendant is in no plight to split hairs on that question or insist on its decision. The liability of the company is fixed before that question is reached, and without any necessary reference to it.

The plaintiff did not deliver his cotton to defendant upon a contract that it would be shipped when convenient, or when an indefinite quantity of freight then in its depot awaiting shipment had been forwarded. If the company had discharged its legal duty to the shipper, it would have advised him of the fact that there would be delay in forwarding the cotton when he offered it for shipment. Not having done so, but having concealed from the shipper this fact, it is responsible for all delay occurring from causes then existing and within its knowledge. The whole delay, whether it occurred before or after the cotton arrived at Hopefield, was the result of the wrongful act of the company in receiving the cotton for immediate transportation, and inducing the shipper to believe it would be carried to its destination without delay, and issuing bills of lading accordingly, when it knew it could not comply with its contract in this regard, and that unusual delay would occur not only on its own road, but as well on its connecting line, by reason of the previous accumulation of freights.

The conclusion reached is supported by adjudged cases. *Tucker* v. *Pacific R. Co.* 50 Mo. 386; *Faulkner* v. *South. Pac. R. Co.* 51 Mo. 311; *Helliwell* v. *Grand Trunk Ry.* 7 FED. REP. 69.

It is conceded that a reasonable time for the transportation of cotton from Little Rock to New Orleans, by the defendant's road to Hopefield and thence by boat to New Orleans, is 10 days. A much longer time than this elapsed between the delivery of the cotton to the railroad and its arrival in New Orleans, during all of which time cotton was declining in price.

The measure of damage is the difference between the market value of the cotton in New Orleans on the day it ought to have been delivered and the market value the day it was delivered. This difference is shown by the testimony of the cotton factors to be $827.37, for which let judgment be entered.