## THE CALEDONIA.

*(Circuit Court, D. Massachusetts. October 1, 1890.)*

1. SHIPPING—BILL OF LADING.
    Where a bill of lading is given by the ship-owner and accepted by the shipper without objection, a prior agreement for the carriage is not a final and definite statement of all the terms of the agreement between the parties, and the bill of lading is the real contract by which the mutual obligations of the parties is to be governed.

2. SAME—WARRANTY OF SEAWORTHINESS.
    Unless otherwise expressly stipulated, there is an absolute warranty on the part of the ship-owner that the ship is or shall be seaworthy at the time of beginning her voyage, and such warranty is not affected by an exception of damages from

"steam-boilers, and machinery or defects therein," inserted in the bill of lading in the midst of a long enumeration of various causes of damage, all the rest of which relate to matters happening after the beginning of the voyage.

3. SAME—DELAY IN DELIVERY—DAMAGES.

Where a ship-owner receives cattle for carriage with knowledge that they are to be sold at the first possible market day after arrival, and there is a delay in their arrival owing to the unseaworthiness of the vessel, he is liable to the shipper for the fall in the market value of the cattle.

In Admiralty. On appeal from district court.

*Russell & Putnam*, for appellants.

*Henry M. Rogers* and *Warren K. Blodgett*, for appellee.

Before GRAY, Justice, and COLT, J.

### FINDINGS OF FACT.

This was a libel in admiralty, in a cause of contract, civil and maritime, by a shipper of cattle against the steam-ship Caledonia, to recover damages caused by the breaking of her shaft. The Caledonia was one of the Anchor Line of transatlantic steam-ships, owned and employed by the claimants, Henderson Bros., as common carriers. The plaintiff was a dealer in and exporter of cattle. The terms of the contract between the parties were as expressed in the following memorandum of agreement, made before the shipment of the cattle, and in the following bill of lading, signed at the time of shipment, and afterwards accepted by the libelant.

### "MEMORANDUM OF AGREEMENT.

"Concluded at New York, the twenty-fifth day of May, 1885, between Messrs. Henderson Brothers, 7 Bowling Green, New York, agents of the steamer Caledonia, hereinafter described as the party of the first part, and Mr. M. Goldsmith, of New York, hereinafter described as the shipper of the second part. The agents of the steamer agree to let to said shipper suitable space, as undernoted, for the transportation of live cattle, that is to say, on the steam-ship Caledonia, for about two hundred and seventy-five to three hundred head of cattle on and under decks. Steamer expected to sail from Boston for London about eleventh of June. The agents agree to fit the stalls in the style customary at the port of Boston, to the satisfaction of inspectors of Boston insurance companies, and the shipper, who will assume all responsibility for same, and for various appliances of ventilation after shipment of the cattle; and the steamer Caledonia undertakes to supply sufficient good condensed water for the use of the animals during the voyage. All water casks, buckets, hose, and similar appliances must be put on board by shipper of the cattle. A reasonable supply of fodder for the animals will be carried by the steam-ship Caledonia, free of freight; but freight, if demanded, shall be payable on any unusual excess of fodder landed at port of destination. Hay and straw to be in compressed bales. The steamer Caledonia will also furnish free steerage passage for attendants (not exceeding one man to every thirty cattle) over and return, providing them with the necessary utensils for the voyage. The agents of the steamer agree to notify the said shipper, at least six days in advance, of the intended departure of the steam-ship, and, twelve hours prior to sailing, of the day and hour. In event of shipper failing to deliver the cattle to steam-ship within twenty-four hours after expiry of due notice, as aforementioned, steamer is to have liberty to sail, and freight is to be paid in full by the party of the second part. The steamer Caledonia agrees to deliver the cattle at Deptford, and the shipper agrees to bear tonnage, dock,

or shed dues when incurred. The cattle are to be delivered and received from steam-ship's decks immediately on arrival at the port of destination. The shipper agrees to ship all the cattle the steam-ship can carry, as above mentioned, paying freight on same at the rate of forty-five shillings British sterling per bullock for all cattle shipped. The shipper agrees to prepay freight on the above-mentioned shipments in current funds, at first-class bankers, selling rate for sight exchange, on the number of cattle shipped at Boston, vessel lost or not lost, and irrespective of the number landed at the port of destination; and the shipper assumes all risk of mortality or accident, however caused, throughout the voyage. The shipper agrees to deliver the cattle on the date and hour ordered by the agents of the steamer, or pay demurrage of the steam-ship for all or any detention incurred by his failure to do so. In case of non-arrival of vessel in time to sail from Boston on or before 18th June, shipper has option of cancellation. Any dispute arising on this contract to be settled by arbitration in the usual way in Boston.        HENDERSON BROTHERS."

### "CATTLE BILL OF LADING.

"Shipped alive, by M. Goldsmith, and at shipper's risk, in and upon the steam-ship called the ' Caledonia,' now lying in the port of Boston, and bound for London, two hundred and seventy-four head live cattle, to be delivered from the ship's deck at the aforesaid port of London; the act of God, the Queen's enemies, pirates, restraint of princes and rulers, perils of the seas, rivers, navigation and land transit, of whatever nature or kind, restrictions at port of discharge, loss or damage from delays, collision, straining, explosion, heat, fire, steam-boilers and machinery, or defects therein, transshipment, escape, accidents, suffocation, mortality, disease, or deterioration in value, negligence, default, or error in judgment of pilots, master, mariners, engineers, stevedores, or any other person in the employ of the steam-ship or of the owners or their agents, excepted; with liberty to sail with or without pilots, to tow and assist vessels in all situations, to call at any port or ports to receive fuel, load or discharge cargo, or for any other purpose, and, in the event of the steam-ship's putting back to Boston or into any other port, or being prevented from any cause from proceeding in the ordinary course of her voyage, to transship by any other steamer unto order, or to his or their assigns. Freight for the said stock to be paid without any allowance of credit or discount, at the rate of £2-5-0 sterling for each animal shipped on deck, and £2-5-0 sterling for each animal shipped under deck, whether delivered or not, vessel lost or not lost, cattle jettisoned in all or in part, or otherwise lost, with average accustomed. In the event of the loss of the vessel, of her not arriving at the said port, or of the consignee neglecting to pay the freight upon the arrival of the vessel, or neglecting to pay the charges and expenses herein mentioned, the shipper, in consideration of the waiving of the payment of the freight in advance, hereby binds and obligates himself to pay the freight above expressed, and such charges and expenses, upon demand. It is also stipulated and agreed by the shipper, as a condition of the shipment, that he will take charge of the stock during the voyage, the vessel furnishing water only; that he has examined the condition of the steamer, the construction of the stalls, and the means of ventilation, and approved of the same, and that no claim shall be made for any loss or damage resulting therefrom; that any mortality, sickness, or deterioration in the condition of the stock shall be presumed to arise from the condition of the animals when shipped, or from natural causes. Consignees to enter the property at the custom-house within twenty-four hours after the ship is reported there, and to remove the same immediately upon being landed, otherwise the property may be discharged by the agents of the ship at the expense and risk of the shipper or consignee of cargo. Porterage of the delivery of the cargo to be done by agents of the ship, at the expense and risk of the receivers. Lighterage, ton-

nage, and shed dues payable by the receivers. This bill of lading, duly indorsed, to be given up to the ship agents in exchange for delivery order. In witness whereof, the master, purser, or agents of the said ship hath affirmed to three bills of lading, all of this tenor and date, one of which bills being accomplished, the others to stand void. In accepting this bill of lading, the shipper, as owner, or agent of the owner, of the property shipped, expressly accepts and agrees to all its stipulations, exceptions, and conditions, whether written or printed.

"*Dated in Boston, Mass.*, 15*th June*, 1885.

"J. MILLER STEWART, for the Agents."

On Monday, June 15, 1885, the libelant shipped on board the Caledonia at Boston, to be delivered at Deptford, 274 head of cattle in good order and condition, and put on board fodder sufficient for a voyage of 15 days, a day or two more than the usual length of voyage, being all the fodder that by the usage of the business he was bound to provide. On the morning of June 24th, the ninth day out from Boston, in smooth weather, the propeller shaft of the Caledonia broke straight across in the stem tube. There had been no heavy weather on this voyage, and the propeller did not strike against any rock or derelict or other object. The cause of the breaking of the shaft was its having been weakened by meeting with extraordinarily heavy seas on previous voyages. At the time of leaving Boston on June 15th, the shaft was in fact unfit for the voyage, and by reason of its unfitness the vessel was unseaworthy. No defect in the shaft was visible, or could have been detected by the usual and reasonable means, if the shaft had been taken out and examined. No negligence on the part of the owners of the steam-ship was proved. By reason of the breaking of the shaft the voyage lasted 25 days, and the cattle were put on short allowance of food, and, in consequence thereof, were landed at Deptford in the afternoon of Monday, July 20th, in an emaciated condition. The market days in London were Mondays and Thursdays. By the usual course of the business of shipping live cattle from Boston to Deptford for the London market, and in accordance with the knowledge and contemplation of both parties at the time of the execution of the memorandum of agreement and the bill of lading, the cattle were not to be sold before arrival, and were sold at the first market after their arrival. The amount of the damages suffered by the libelant was as stated in the following agreement, signed and filed by the counsel of the parties:

"It is hereby agreed that the whole amount of damages suffered by the libelant (exclusive of interest) arose from two sources of loss: shrinkage in the weight of cattle from the protracted voyage, and fall in the market value of the cattle during the delay in arrival; and that these two causes together made the loss seven thousand eight hundred and fifty dollars, and that one half thereof, to wit, three thousand nine hundred and twenty-five dollars, was and is to be attributed to each cause."

### CONCLUSIONS OF LAW.

There was a warranty that the vessel was seaworthy at the time of sailing from Boston. This warranty was not affected by the exceptions in the bill of lading. The breach of the warranty was the cause of all the damage claimed. The libelant is entitled to recover $7,850 and interest.

GRAY, Justice.   A contract for the carriage of goods by sea may doubtless exist without a bill of lading; and, when the parties have made such a contract, the ship-owner cannot, without the shipper's consent, vary its terms by inserting new provisions in a bill of lading, and the shipper may decline to assent to the modifications, and insist upon his right to have the goods carried under the original contract.   *Jones* v. *Hough*, 5 Exch. Div. 115; *Crooks* v. *Allan*, 5 Q. B. Div. 38, 40, 41; Lord BRAMWELL, in *Sewell* v. *Burdick*, L. R. 10 App. Cas. 74, 105.   But the bill of lading is often given by the ship-owner and accepted by the shipper as expressing the terms of the agreement between them, and when this is the case both parties are bound by its provisions.   *Glyn* v. *Dock Co.*, L. R. 7 App. Cas. 591, 596; *Chartered M. Bank of India* v. *Netherlands, etc., Co.*, 10 Q. B. Div. 521, 528; *The Delaware*, 14 Wall. 579.   In the case at bar the original contract, although containing no mention of a bill of lading, was evidently a preliminary memorandum only, and not a final and definite statement of all the terms of the agreement between the parties.   For instance, it did not even except perils of the sea, yet it is incredible that either party contemplated or intended that the carrier should be liable for such perils.   And the shipper not only, without objection, accepted and forwarded to the consignees their bill of lading, but in the usual course of business between the parties, both before and after this shipment, he accepted similar bills of lading under like circumstances. It is a necessary conclusion of fact, as well as of law, that the bill of lading was understood and intended to be, and was, evidence of the real contract by which the mutual obligations of the parties were to be governed.   The shipper is therefore bound by the exceptions in the bill of lading, as far as those exceptions are valid in law.   So far as they undertake to exempt the carriers from responsibility for the negligence of their servants, they are inoperative and void.   *Liverpool & G. W. Steam Co.* v. *Phenix Ins. Co.*, 129 U. S. 397, 9 Sup. Ct. Rep. 469.   But in this case, as no negligence is proved, that part of the exception is immaterial.

In every contract for the carriage of goods by sea, unless otherwise expressly stipulated, there is a warranty on the part of the ship-owner that the ship is seaworthy at the time of beginning her voyage, and not merely that he does not know her to be unseaworthy, or that he has used his best efforts to make her seaworthy.   The warranty is absolute that the ship is, or shall be, in fact seaworthy at that time, and does not depend on his knowledge or ignorance, his care or negligence.   *Work* v. *Leathers*, 97 U. S. 379; *Cohn* v. *Davidson*, 2 Q. B. Div. 455; *The Glenfruin*, 10 Prob. Div. 103.   In the case at bar, the unseaworthiness of the vessel consisted in the unfitness of her shaft when she left port, and that unseaworthiness was the cause of the damage to the libelant's cattle. The exception of "steam-boilers and machinery, or defects therein," inserted in an instrument framed by the ship-owners, and in the midst of a long enumeration of various causes of damage, all the rest of which relate to matters happening after the beginning of the voyage, must, by elementary rules of construction, and according to the great weight of au-

thority, be held to be equally limited in its scope, and not to affect the warranty of seaworthiness at the time of leaving port upon her voyage. *Kopitoff* v. *Wilson*, 1 Q. B. Div. 377; *Steel* v. *Steam-Ship Co.*, L. R. 3 App. Cas. 72; *The Glenfruin*, 10 Prob. Div.' 103; *Tattersall* v. *Steam-Ship Co.*, 12 Q. B. Div. 297; *The Rover*, 33 Fed. Rep. 515. ' The opinion in *The Miranda*, L. R. 3 Adm. & Ecc. 561, so far as it tends to a different conclusion, is contrary to the later cases; and in *The Laertes*, 12 Prob. Div. 187, the bills of lading expressly restricted the warranty of seaworthiness to cases in which there had been a want of ordinary and reasonable care.

It has been held by the highest courts of Michigan, Massachusetts, and New York, upon reasons which appear to us conclusive, and which it is unnecessary to restate, that a common carrier, receiving goods for carriage, and by whose fault they are not delivered at the time and place at which they ought to have been delivered, but are delivered at the same place afterwards, and when their market value is less, is responsible to the owner of the goods for such difference in value. *Sisson* v. *Railroad Co.*, 14 Mich. 489; *Cutting* v. *Railway Co.*, 13 Allen, 381; *Ward* v. *Railroad Co.*, 47 N. Y. 29. The same general rule has been often recognized as applying to carriers by sea in this circuit as well as in the second circuit. *Oakes* v. *Richardson*, 2 Low. 173, 178; *Page* v. *Munro*, Holmes, 232; *Rowe* v. *The City of Dublin*, 1 Ben. 46; *The Success*, 7 Blatchf. 551; *The Giulio*, 34 Fed. Rep. 909. But this case does not require us to go so far, because it clearly appears that these parties, at the time of contracting together, knew and contemplated that the cattle were not to be sold before arrival, and were to be sold at the first possible market day after arrival; and, under such circumstances, there can be no doubt whatever that the carrier is liable to the shipper for the fall in the market value of his goods. *Telegraph Co.* v. *Hall*, 124 U. S. 444, 456, 8 Sup. Ct. Rep. 577; *The Parana*, 2 Prob. Div. 118, 121, 123. Decree affirmed, with interest and costs.