### UNITED STATES v. MIDDLETON et al.*

(Circuit Court of Appeals, Fourth Circuit. November 19, 1924.)

No. 2179.

**1. Shipping ⊚⇒118 — Owner had burden of justifying delay.**

Owner, sued by shipper for delay, due to taking of piece of machinery for use in another of owner's vessels, had burden of justifying delay.

**2. Shipping ⊚⇒118—Burden of proof on part of owner, in action for delay caused by repairs, stated.**

Owner, sued for delay because of repairs, was bound to show that repairs were necessary, that approximate time therefor could not have been ascertained before bill of lading was signed, that work of repair was entered on and transacted with due diligence, and part of delay for which it could not fairly be held answerable, if part of delay was excusable, and part not excusable.

**3. Shipping ⊚⇒118 — Evidence held to prove that shippers expected immediate shipment when they put cotton on board vessel.**

In suit for delay in transportation of shipment of cotton, evidence *held* to prove that shippers' agents expected immediate shipment when they put cotton on board vessel.

**4. Shipping ⊚⇒118—Evidence held not to prove delay because of repairs reasonable.**

In action for delay in transportation of shipment of cotton, evidence *held* insufficient to prove delay because of repairs reasonable.

**5. Shipping ⊚⇒118, 121(1), 138—Failure to repair before voyage held to deprive owner of right to limit liability and render it liable for damage by stranding and from delay.**

Where vessel was stranded because of defective steering gear, and such defect manifest-

*Certiorari denied 45 S. Ct. 463, 69 L. Ed. —.

ed itself before vessel was put to sea, and owner did not use due diligence to remedy the trouble, it was not entitled to protection of Harter Act (Comp. St. §§ 8029–8035), and could be held liable, in a proper proceeding, for physical damage to cargo done by stranding and its aftermath, as well as for any loss resulting from the additional delay caused.

**6. Shipping ⊚⇒143—Broker, who loaded cargo on ship after expiration of certificate of inspection, held not liable to owner.**

Broker, in loading goods on ship owned by government and operated by another, *held* required merely to act in good faith, and not liable to government on recovery by shipper from owner of damages for delay in shipment, merely because it knew certificate of inspection had expired, and knew that under government's general policy, the operator could not transport goods from the particular port.

**7. Shipping ⊚⇒106—Owner bound by bills of lading issued by operator pursuant to authority from owner.**

Government, having authorized operator of government-owned vessel to sign and deliver bill of lading, was bound by the bills issued.

**8. Shipping ⊚⇒118—Owner held not liable to shipper's agents for delay in shipment.**

Delay in shipment did not render owner liable to shipper's agents, who had no property at risk in the venture, on theory that, if venture had been successful, shipper would have been satisfied with its bargain, and would have done more business through agents, on which agents would have realized profit.

**9. Limitation of actions ⊚⇒124—Underwriters' petition of intervention in shipper's action against owner for delay held not to state new cause of action.**

In shipper's action against owner for difference between market value of cargo, if delivered in the ordinary course of transportation, and the net sum received on resale necessitated by damage and delay, where both sides introduced evidence on question where stranding of vessel was due to unseaworthiness, underwriters' petition of intervention, seeking amount paid by it to shipper, filed more than two years after cause of action arose, *held* not barred, since such petition did not state new cause of action.

**10. Shipping ⊚⇒118—Measure of damages for delay in shipment of cotton stated.**

Shipper's measure of damages for delay in transportation of cotton is not merely interest on value of cotton during period of delay, but the difference between the market value at place of destination, when it should have been delivered, and what it brings in same market when delivery is actually made, with interest.

Appeals and Cross-Appeals from the District Court of the United States for the Eastern District of South Carolina, at Charleston; Henry A. Middleton Smith, Judge.

Suit in admiralty by Charles F. Middleton and others, a copartnership under the firm name and style of Middleton & Co., for themselves and as agents for and on behalf of Teikoku Menkwa Kabushiki Kaisha, a Japanese corporation, and another, against the United States, in which the Standard Marine Insurance Company, Limited, intervened, and the Carolina Company was brought in. From the decree rendered (286 F. 548), the libelants and the United States appeal. Modified and affirmed.

See, also, 273 F. 199.

J. Frank Staley, Sp. Asst. Atty. Gen., in Admiralty (Glen R. Snider, Admiralty Counsel U. S. Shipping Board, of New York City, H. T. Atkins, Sp. Asst. Atty. Gen., and J. D. E. Meyer, U. S. Atty., of Charleston, S. C., on the brief), for the United States.

Alfred Huger, of Charleston, S. C. (Miller, Huger, Wilbur & Miller and E. Willoughby Middleton, all of Charleston, S. C., on the brief), for Japanese corporation and Standard Marine Ins. Co., Limited.

E. Willoughby Middleton, for Middleton & Co. and Japanese corporation.

Julian Mitchell, of Charleston, S. C. (Mitchell & Horlbeck, of Charleston, S. C., on the brief), for Carolina Company.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

ROSE, Circuit Judge. A Japanese corporation by cable bought cotton in this country, and through American agents bargained to have its purchase carried to one of its own cities. The transportation was delayed, and both the shipper and its agents sought to avail themselves of the Suits in Admiralty Act to recover what they said were their respective losses from the United States, whose ships had undertaken the carriage. It is scarcely denied that there was tardiness and resulting injury, but the United States, in addition to raising a question of jurisdiction, or perhaps it would be more accurate to say of venue, says that it cannot be held responsible for the harm that was done, and adds that, even if it could be, there are others who are answerable over to it. These it has attempted to bring into the case, invoking to that end the fifty-sixth admiralty rule. To the claim of the agents it replies that under settled principles of law no recovery can be had for such an injury as that of which complaint is made. It asserts that the owner of the cotton may not

measure its damages by the standard it would use, and in any event is not entitled to a decree for such portion of its loss as was covered by insurance and was made good by the underwriter, because, as the United States contends, if the owner of the cotton was awarded anything for such part of its loss, it would be put in a position to secure double payment for some of the injury done it. The United States further argues that the underwriter may not recover what it has paid, either in the name of the insured or in its own, because it did not file its petition of intervention within two years after the cause of action arose.

The learned court below sustained its right to hear and determine the cause. It held that the United States was responsible for some, but not for all, of the delay, and must answer to the owner of the cotton, but not to the latter's agents in their individual capacity; that the United States could not call on any one else to reimburse it for what it was required to pay to the owner of the cotton; and that the underwriter had not lost its right to demand indemnity from the government. The United States, the Japanese corporation, and the latter's agents have severally appealed; the first because it was required to pay anything, and because it was not allowed to recover over from those it had brought in, the second because it was not awarded all it thinks it should have, and the third because they were given nothing.

In the discussion of the law and of the facts, it will be necessary to refer rather frequently, not only to the parties to the cause and to certain agencies through which the United States acted, but to one other body corporate as well. Those which or who will be the most often spoken of are (1) Teikoku Menkwa Kabushiki Kaisha, a Japanese corporation, located at Osaka, Japan; (2) a copartnership, made up of three citizens of South Carolina, viz. Charles F. Middleton, Charles F. Middleton, Jr., and G. Abbott Middleton, resident at Charleston, in that state, and doing business as Middleton & Co.; (3) the Carolina Company, a body corporate having its office in the same city of Charleston; (4) the American Shipping Corporation, with headquarters at Jacksonville, Fla.; (5) the United States, acting through the United States Shipping Board and/or the United States Shipping Board Emergency Fleet Corporation (as in this case there will be no occasion to distinguish among the three, they will be consid-

ered as one); and (6) the Standard Marine Insurance Company, Limited, a British corporation, of Liverpool, England. For brevity these six will be herein designated as (1) the Shipper; (2) the Agents; (3) the Broker; (4) the Operator; (5) the Owner; and (6) the Underwriter, respectively.

On March 2, 1920, by cable the Shipper bought from the Agents 500 bales of cotton for March-April shipment to Kobe, Japan. The understanding was that the Agents were to arrange for the transportation, for which the Shipper was to pay. The Broker carried on the business of freight broker and forwarding agent, and by the custom of the trade received its compensation from the shipowners or operators for whom it secured goods for carriage. The Agents applied to it for freight space for the 500 bales from Charleston to Kobe. The Operator was managing for the Owner a number of the latter's vessels. A week or two earlier one of the officers of the Broker had had a conversation with an official of the Operator, in the course of which he had been asked to aid the Operator in getting a cargo for one of these, which as a general ship it was about to send from Jacksonville to the Far East. The Broker knew that the West View, another of the Owner's vessels and also under the management of the Operator, was in Charleston and about to go to Jacksonville. The Broker thought it might be good business for the Operator to carry the 500 bales on the West View to Jacksonville and thence on its other ship to Kobe, and thereby earn a freight of nearly $5,000. The Broker accordingly inquired of the Operator whether it was willing to undertake the carriage, and, if so, at what rate of freight. On the 12th of April, 1920, the Operator answered, telling the Broker to put the cotton on the West View, which would carry it to Jacksonville, where it would be transhipped to the Deer Lodge, and by the latter would be taken to Kobe. It said that it would charge $2 per 100 pounds to carry the cotton from Charleston to Kobe, in addition to which the Shipper would have to pay the actual cost of transhipping the cotton at Jacksonville, not, however, to exceed 80 to 90 cents a bale; that is to say, 16 to 18 cents a hundred.

Upon the receipt of this letter the Broker at once got into touch with the Agents, who without further ado accepted the proposed terms as and for a through shipment from Charleston to Kobe. One of the Agents testified that at that time he understood that they would have to act promptly if the cotton was to reach Jacksonville in time to connect with the ship about to cross the Pacific. On the very next day, the 14th of April, the Broker and Agents began to load the cotton on the West View. On the last-named day, the Broker inclosed to the Operator a so-called shipper's guaranty, hereinafter more particularly described, the receipts of the mate of the West View showing that the cotton was on board his ship, and the Agents' check for $4,946, the freight from Charleston to Kobe, at $2 per 100 pounds. The Broker, in its covering letter, called attention to the fact that the rate on cotton from Savannah to the Orient was only $1.75 per 100 pounds, and asked whether Charleston was not entitled to as favorable terms. Six days later, on the 21st, the Operator acknowledged the receipt of the Broker's letter and its inclosures, and said that it could not give a lower rate than $2, because the Owner was inquiring whether the cotton was being carried free from Charleston to Jacksonville. It sent with its letter a bill of lading for the cotton, undertaking thereby to carry the bales by the West View from Charleston to Jacksonville, and by the Deer Lodge or substitute to Kobe, via the customary coal and cargo ports. The bill was dated Charleston, April 15. Upon its receipt by the Broker it was delivered to the Agents, who thereupon drew upon the Shipper for the purchase price, freight, and insurance premiums, and attached to the draft the bill of lading and the other customary documents, and sent them forward through the usual banking channels. The Shipper, upon presentation of the draft, duly honored and paid it.

The testimony shows that ordinarily a cargo ship makes the voyage from an Atlantic to a Japanese port in somewhere from 60 to 90 days, and that business in cotton is carried on upon the assumption that that time will not be exceeded, in the absence of extraordinary circumstances. When the Deer Lodge, many months later, sailed from Jacksonville for Japan, she made the trip in 70 days. As the Shipper bought the cotton for March-April shipment, it had good reason to believe that its purchase would arrive in Japan some time in the month of July at the latest, and when the draft and the bill of lading, dated April 15, came to hand, it might well have looked for a still earlier delivery. In point of fact, as will be presently seen, the cotton did not leave Jacksonville until August 11, and then, in

consequence of the stranding of the ship upon which it was, it was necessarily brought back to Jacksonville, and in the middle of November was still there. By consent of all parties, and without prejudice to the rights of any of them, it was, in an attempt to minimize damage, reconditioned, taken to Savannah, and there sold for the best price which could be obtained for it. It realized between one-fourth and one-fifth of what the Shipper had paid for it, and of what it would have fetched in Japan, had it reached that country at any time prior to the middle of August. Some of this great shrinkage in value was brought about by the physical damage caused by the stranding, but the greater part of it was the result of that catastrophic drop in the market price, not only of cotton, but of countless other commodities, which will long make the late summer and fall of 1920 memorable in economic history. The cotton was held in this hemisphere so long because many things were allowed to go wrong.

When the West View reached Charleston her certificate of inspection had expired, and until it was renewed she could not legally carry cargo anywhere. She was, moreover, in need of repairs, and until they were completed a new certificate would not be granted her. Some of the required repairs were to be made in Charleston, but the Operator intended to have most of them done at Jacksonville, at which port she was to receive her final inspection. Perhaps neither Broker nor Operator knew that, after the expiration of her certificate, the law and the regulations forbade her to transport cargo, or if they, or either of them, were or had been accurately informed on that subject, they may not have thought of these rules in connection with the matter in hand. It is, however, still more probable that they believed the inspectors would permit the West View to take the cotton to Jacksonville. The ship was owned by the United States. It was in any event to go to Jacksonville. The voyage from Charleston was of the shortest and the cotton weighed only 125 tons. At all events, Broker and Operator put the cotton on the ship, and the latter issued, and through the former delivered to the Agents, a bill of lading for it. There is nothing in the record to show that, before the bales were placed upon the West View, the Agents had any actual knowledge that she was without an effective certificate of inspection, and it is certain that the Shipper had not.

The inspectors proved obdurate, and insisted that the cotton must be taken off the West View before she would be allowed to go to Jacksonville. All the influence that the Operator and apparently the Shipping Board had was exerted in a vain attempt to have the ruling modified, and then on the 24th and 25th of April, the cotton was unloaded from the West View, precisely 10 days after it had been put aboard her. Then and not until then was she allowed to sail for Jacksonville, at which place she arrived on April 28, there to remain for some 5 months.

Subsequently the Operator sent the Bancroft, another ship belonging to the United States, to Charleston for the cotton. On May 7th, with the cotton on board, it started for Jacksonville, arriving there on the 9th. By the 11th the cotton had been put ashore. From the above recital of what actually happened, it appears that the voyage from Charleston to Jacksonville takes from 2 to 3 days, that 2 days sufficed to put the cotton on the ship, and that the taking it off was as speedily accomplished. Had the West View sailed so soon as the cotton was put aboard her, she would have completed its landing at Jacksonville by the 20th of April, precisely 3 weeks before it actually was landed there. The Owner would ignore this cause of delay as altogether immaterial. The Owner asserts it did no harm, for the cotton after all reached Jacksonville months before there was any ship there ready to take it to Japan.

It will be recalled that the bill of lading designated the Deer Lodge as the vessel which was to carry the cotton from Jacksonville to its Oriental destination, unless the Owner exercised the right it reserved to substitute another ship for her. What justification, or explanation even, there was for putting the name of the Deer Lodge in the bill of lading, is a mystery. When the bill was signed, the Deer Lodge was in the British trade, and perhaps was actually in English waters. So far as the record discloses, neither Owner nor Operator at that time had any idea of sending her presently to the Far East. On the contrary, as early as March 31, the Naiwa, which 2 days before had arrived at Jacksonville from Savannah, had been designated to make the Oriental voyage. By April 5—that is, 10 days before the bill of lading was signed—the time for loading her for that venture had been fixed for later April or early May, and May 15 had been set as her sailing day. These

dates are entirely consistent with the information the Agents say they received that their cotton must get to Jacksonville very shortly after April 15, if it was to make the desired connection.

The record gives no satisfactory answer to the query why the Naiwa, which was expected to start on the 15th of May, did not actually break ground until the 11th of August, nearly 3 months later. It is true it is shown that during the interval she was undergoing repairs, and that she needed them is not left in question. Indeed, the history of what happened when she finally got under way suggests very strongly that, after all, she left before her overhauling was complete. And yet an exceptionally competent witness, whom the Owner itself put upon the stand, says that at the Owner's request he examined her on March 18 at Savannah, where she then was, and that the repairs she required could and should have been made in from 3 weeks to a month. Another swears that she had been expected to sail in late April, and a third testified that with due diligence all necessary repairs could have been finished in time to have allowed her sailing by May 15. The Owner's explanation of the slowness with which they were in fact made is not impressive. It is said that there was a strike at the shipyard in which the repairs were being made. True enough, but it did not begin until a month or more after the Naiwa should have been well out to sea. There were misunderstandings as to who was to be employed to make the repairs. The preparation of the specifications for them, and the securing of bids for making them, were conducted in such a piecemeal fashion as to make delay inevitable. There is more than a suggestion that a person put by the Owner in charge of the refitting of the ship was found so careless and incompetent that he had to be discharged. A necessary unit of her machinery was taken out of her, because the Owner wanted to put the article in question in another of its ships, and some time elapsed before the resulting deficiency in the Naiwa's equipment was made good.

[1] As we recall, no reason has been given for thus subordinating the interests of the Shippers by the Naiwa to the convenience of the common Owner of it and of the other vessel. If a delay so caused ever could be justified, the burden of establishing the justification was upon the Owner. The Giulio (C. C.) 34 F. 909.

[2-4] It was also bound to show, first, that the repairs were not only necessary, but that the approximate time they would take could not have been ascertained in the 17 days in which the Naiwa lay at Jacksonville before the bill of lading was signed; second, that the work of repair was entered upon and prosecuted with due diligence; and, third, if part of the delay in completing it and in loading the ship was excusable, and part was not, what was the actual duration of that for which it could not fairly be held answerable. In spite of its knowledge of the facts, it has failed to prove any one of the three. When should the Naiwa have sailed? Her Owner and the Operator, in later March and early April, themselves expected her to get away by May 15, and we cannot find in the record any sufficient reason why she should not have done so. We have not lost sight of the fact that the able, learned, and experienced judge who heard the case below concluded that under all the circumstances, if she had sailed by June 15, she would have done all that could have been required of her. This conclusion was largely based upon his finding that from 36 to 38 days were reasonably required to put her cargo on board. He saw and heard the witnesses. We differ from him with great hesitation, but nevertheless we cannot help feeling that he has not given sufficient weight to the testimony of two of the Owner's own witnesses, who say that with due diligence she could have been ready to sail by May 15. They were men apparently of much practical experience in shipping matters, and they knew what cargo she had undertaken to carry. In the face of this evidence and of the established fact that as late as April 5 the Owners expected her to sail by the 15th of the then succeeding month, we do not feel justified in now allowing her, at the expense of the Shipper, a month's additional time.

We find ourselves, moreover, unable to agree with the view of the learned court below that the Agents, when they put the cotton on the West View, did not expect any very immediate transportation of it to Jacksonville. They swear that they did, and in view of the testimony of the witnesses for the Owner, that the Operator, as late as April 5, expected the Naiwa to weigh anchor on May 15 for her Eastern voyage, it is quite probable that all the other parties were then of like mind. Physically the West View was quite able to go at once to Jacksonville, as in fact she did, so soon as the inspectors gave her leave. We see no

reason to doubt that, when the cotton was put upon her, the Operator and the Broker alike thought that she would be permitted to take it to Jacksonville, and there is nothing to suggest that the Agents could have been better informed. They appear to be reputable people. They had sold the cotton to the Shippers for March-April shipment. They were familiar with the usages of the trade, and understood the importance of promptness. They had the cotton on the West View by April 15, and subsequently received for it a bill of lading bearing that date. They attached that bill to the draft they drew upon the Shipper, and thereby in effect represented that they had complied with their bargain to ship the cotton during April. It is true that the cases hold that, under such agreements as that between the Agents and the Shipper, the shipment is made when the goods are received on shipboard, even though there is subsequently some delay in the sailing; but that we opine is only when the seller when he makes the contract for carriage really believed that the voyage is about to begin, and the rule would not protect him if he at that time knew that indefinite delay in getting under way was probable. Moreover, the evidence shows that the Agents were very anxious to build up Japanese connections, and were more than usually desirous to get and keep the good will of the Shipper. Under such circumstances it is highly improbable that they would have been indifferent as to whether the cotton had quick dispatch.

The Owner asserts that the signing by the Agents of the Shipper's guaranty, to which passing reference has already been made, shows two things: First, that the voyage for which the Owner bound itself was to begin at Jacksonville, and not at Charleston, and that the Agents, when they executed the guaranty in question, knew that it was possible that the cotton would not leave Jacksonville before August 31. In the cotton shipping business, it is usual for shippers, whose cotton is in the first instance to go to a port whence it is to be further carried, to give the shipowner a guaranty by which, in consideration of the latter's signing bills of lading for cotton in or about the port, but not as yet actually on shipboard, they waive with the consent of their underwriters all claims against agents, masters, ships, and their owners for liability under such bills of lading for loss or damage by fire and/or storm or exposure to weather occurring prior to the actual receipt of the cotton by the ship. To save the execution of numerous papers, the guaranty is usually so worded as to cover all shipments from the port in question, made for account of the particular shipper during an entire cotton year; that is to say, from one 1st of September to the next succeeding 31st of August. It happened that the Agents had as yet given no guaranty for Jacksonville for the cotton year 1919–1920, and so they, at the request of the Broker, on the 14th of April, and with the written consent of the Underwriter, executed and delivered one which the Broker unquestionably desired for the purpose of covering these very 500 bales, but which as usual was so worded as to apply, not only to them, but to any other cotton which before September 1st the Agents might send to Jacksonville for shipment thence.

It is not suggested that the losses which give rise to the present controversy were caused by anything to which the guaranty applied, but the Owner argues that the giving of it shows that the Agents understood that they were not making a through shipment from Charleston to Japan, and that even in April they thought that the cotton might not leave Jacksonville before the end of August. It is, however, proved that the 31st day of August is the date of expiration usually and perhaps invariably named in these guaranties, and that its presence in the one in question is absolutely without significance. In view of the plain provisions of the bill of lading which was given for the cotton, we cannot attach any importance to the assumption by the Agents of the risk of damage by fire or weather in the interval between the bales being taken off one ship and being put upon the other. The truth doubtless was that the guaranty was one of the documents for which the Operator was in the habit of asking, and which the Agents were accustomed to give, and that neither of them intended that its wording should throw light upon anything except the rights of the parties in the event of the happening of one of the contingencies named in it.

On August 11, the Naiwa finally broke ground. Three days and a half later, in weather not at all out of the ordinary, and when unknown to her officers she was many miles off her course, she went hard aground upon a reef in the Bahamas. There she remained for some weeks. When she was finally floated, it was found that she had sustained such injuries that she was unfit to proceed, and she was perforce towed back to

Jacksonville. It was not until the middle of November that her cargo was transferred to the Deer Lodge, and she was then taken to Philadelphia in tow, for the repairs which she required. These were completed in about 6 months more, but it would seem that she has ever since been laid up in the Delaware.

It is unnecessary to examine in detail the testimony as to why she stranded. It is sufficient to say that we find ourselves at one with the learned District Judge in his conclusions that her defective steering gear was a proximate cause of the disaster, that its deficiency manifested itself before she put out to sea, and that the Owner did not use due diligence to remedy the trouble. Under these circumstances we need not consider the further allegation of the Shipper that some of the Naiwa's officers were incompetent, that their lack of capacity contributed to getting her into trouble, and that the Owner has failed to show that in their selection it exercised the care incumbent upon it.

[5] These findings necessarily deprive the Owner of the protection of the Harter Act (Comp. St. §§ 8029–8035), and in a proper proceeding render it liable for the physical damage done by the stranding and its aftermaths, as well as for any loss resulting from the additional delay they caused. Is this such a proceeding? In the court below the Owner contended it was not. It said that the court had no jurisdiction of it as in rem, because none of the four steamships concerned, viz. the West View, the Bancroft, the Deer Lodge, and the Naiwa, were in the Eastern district of South Carolina at the time the libel was filed, and none of them had since come into it; and it was equally without the power to take cognizance of it in personam, because the Shipper, a Japanese corporation and therefore a nonresident of the district, had no place of business therein.

The Owner assigned error to the overruling of these objections by the court below, but has not here argued them, either in its printed brief or orally at our bar. Its silence is doubtless explained by the fact that, subsequently to the ruling of the court below, the Shipper filed substantially identical libels in the Eastern district of Pennsylvania, the Eastern district of Virginia, and the Southern district of New York, in some one of which was to be found every one of the ships involved in the controversy. These libels were with the consent of all the parties removed to the court below, and were

there consolidated with the one originally filed therein. The question as to whether jurisdiction had earlier attached thereby became academic. We need therefore not pass either upon it or upon whether, assuming that the objection of the Owner was sound when made, it was not subsequently waived by the Owner's seeking to bring in under the fifty-sixth admiralty rule the Agents and the Broker, and by its asking affirmative relief against them. Texas & Pacific Rwy. Co. v. Eastin & Knox, 214 U. S. 153, 29 S. Ct. 564, 53 L. Ed. 946.

[6] The Owner here still insists that the court below erred in failing to sustain its demand upon them. It says that the Operator under its contract with it had no right to load merchandise on any of its ships at any port other than Jacksonville, and that the Broker had or must be assumed to have had knowledge of this limitation upon the Operator's authority, and that, moreover, when the Broker had the cotton put upon the West View, it knew or should have known that the ship would not be allowed to carry cargo to Jacksonville. It contends that, under such circumstances, the Broker, in asking for the bill of lading, in accepting it from the Operator, and in delivering it to the Agents for transmission to the Shipper, made itself a party to a fraud, and that, if the Shipper's lack of knowledge of these facts precludes the Owner from setting them up as against it, nevertheless the Owner has a right to require the Broker to answer over to it for any liability it may be under to the Shipper. It is argued that the Agents stand in this respect in no different position from the Broker, because they were stockholders in the latter, and one of them was a director of it.

As we are of opinion that the learned court below was right in holding that the Owner has not proved facts sufficient to impose any liability upon the Broker, it is needless to inquire whether the Broker and Agents are correct in their contention that, if the claims of the Owner could be sustained in any tribunal, they are not of admiralty cognizance, and cannot be set up in this proceeding, whether by a petition under the fifty-sixth rule or otherwise, or whether the circumstance that the Agents held stock in the Broker, and that one of them had a seat on its board, were in themselves sufficient to charge the Agents with knowledge of what the Broker knew in the premises.

The Owner has not proved that the Broker, at the time it acted for the Operator in

putting the cotton upon the West View, knew or should have known that the ship would not be allowed to carry it to Jacksonville. It is true that the certificate of inspection of the West View had then expired, and it is quite possible that the Broker may have heard of that circumstance. It was, however, not charged with any duty in the premises, except that of acting in good faith in what it did. It was under no obligation to keep in mind all the consequences which might follow from the West View's lack of a certificate. It had a right to assume that the Operator knew what it was doing or authorizing.

It may for the purposes of this case be assumed that, as between Owner and Operator, the latter was not entitled to load ships intrusted to its management at any port other than Jacksonville, unless with the special permission of the Owner. It may be argued that the Broker had sufficient general knowledge of the Owner's policy in this respect to suggest to it that the Operator was subject to this limitation. Even so, it also knew why the limitation was imposed. The Owner had many operators. To avoid conflicts among them, it was necessary to keep any one of them from trespassing upon territory allotted to others. It was therefore expedient to say to every one of them: You may not go out of your own port without first obtaining the Owner's special permission to do so. There were occasions upon which it was to the Owner's interest to give this license, and then it did. So far as the record discloses, the Broker itself was the only operator at Charleston. There was, therefore, no apparent reason why the Owner should have hesitated to permit the Operator to earn nearly $5,000 for it in the manner attempted. Indeed, the Owner has not shown that such permission was not given. It is clearly established that it was promptly informed of what the Operator proposed to do, and it made no objection. It received the freight money in consideration of which the through bill of lading was issued, and has ever since retained it. As the court below held, it has made out no case against either Broker or Agents, and its petition against them was properly dismissed.

[7] The relations between the Operator and the Owner had at different times, and perhaps at the same time with reference to different vessels, been regulated by distinct contracts. There is some difference between the parties as to the one which was applicable to the matters here in controversy. We do not find it necessary to go into this dispute, as in any event the Owner authorized the Operator to sign and deliver bills of lading. The Owner is therefore bound by the bills issued for the cotton with which we are here concerned, and which for full value passed into the hands of the Shipper, which knew nothing of anything irregular in their issue, if, indeed, any irregularity there was.

[8] Before passing upon the measure of the liability of the Owner to the Shipper, it may be as well to dispose of the claim which the Agents make against the Owner. No tangible property of theirs was at risk in the venture. Nothing that was done or omitted put them under legal obligation to incur any expense. They assert, however, that the long and unjustifiable delay in sending forward the cotton subjected them to losses no less real and substantial than those caused the Shipper. Their complaint is that this particular transaction was the first they had ever had with the Shipper, and indeed the only one that for 20 years they had had with anybody in Japan. They produce testimony tending to show that, if the cotton in question had arrived when it should, the Shipper would have been satisfied with its bargain, and with what the Agents had done concerning it, and would have been eager to do more business with them, and that the Shipper would have bought 10,000 more bales of cotton from or through them, upon which they would have realized a profit of $10,000.

They do not cite a case in which, upon similar facts, a recovery has been had, and they admit that they cannot; but they insist that the right to one "is essential to a logical system of tort liability." We need not here consider what limitations, if any, there may be upon the universality of the rule that every one must make good the harm which is the proximate result of his wrongfully doing what he should not, or of his wrongfully leaving undone that which he should have done; for it is clear the injury of which the Agents complain is not in legal contemplation a proximate consequence of the Owner's shortcomings. Such a loss as the Shipper suffered might possibly have broken it, although it did not. Had it done so, many of its officers and employees might have been thrown out of work, some of them perhaps for a long time. Would not their claim against the Owner, whose negligence caused the loss, which brought about the bankruptcy and thereby deprived them of their incomes, have been as good as that

of the Agents` and quite as appealing? The fact is that nothing the Owner did or left undone by itself or of itself did the Agents any harm. Before hurt came to them, it was necessary that the mind and will of another should come into play, and should reach and act upon one conclusion, rather than upon another to which it was equally free to come, and to which, indeed, upon the facts, justice required it to come. Upon the Agent's own showing they were not responsible for anything which went wrong, or which the Owner did or left undone to the Shipper's hurt. They lost the latter's business because it unfairly, if not altogether, unnaturally chose to hold them blamable for what they were powerless to prevent. Nothing in the Owner's conduct, no matter how severely it may be judged in itself, attacked the business reputation of the Agents. The learned District Judge was clearly right in dismissing their claim as untenable.

[9] The Shipper's original demand was for the full amount of the loss it had suffered. Part of this was the result of the stranding of the Naiwa. Upon our findings that the ship went on the reef because of a defect in her steering gear existing at the inception of her voyage and which the Owner did not use due diligence to correct, it is not disputed that the Owner would be liable to the Shipper for any damage which was the proximate outcome of the accident. It is, however, argued that the Shipper has lost its right to recover for that portion of its loss, because it has been paid by the Underwriter. The learned court below so held, not because of any doubt as to the general rule that an insured may in its own name sue on behalf of an Underwriter who has paid a loss, but because the court thought that the Shipper's libel had not sought to recover for anything other than the damage resulting from the delay. What was subsequently done relieves us from the necessity of considering the soundness of this ruling. After the court below entered its decree denying the right of the Shipper to recover for the amount paid by the Underwriter, the last named, acting upon the permission given it by the decree itself, filed its petition of intervention, asking that the Owner be required to pay such sum directly to it. The Owner objected that the Underwriter had slept upon its rights, and had not filed its petition until more than two years after its cause of action arose. The court overruled the objection and in our opinion was right

in so doing. The Shipper's original libel asked that the Owner be decreed to pay it the difference between the market value of the 500 bales in Japan, when in ordinary course they should have been delivered there, and the net sum received for them when, by the agreement of the parties, they were sold in Savannah. In that difference was necessarily included the diminution in value resulting from the damage done by the stranding. The question of whether the Naiwa's going upon the reef was due to her unseaworthiness was thoroughly gone into. Both sides put in much testimony upon it. Under such circumstances it would be technical overmuch to hold that the Underwriter's petition set up a new cause of action.

[10] There remains for consideration what is the proper measure of damage for the loss caused by the delay in delivery. The Owner says that at the most the Shipper is not entitled to more than compensation for the loss of the use of its property during the continuance of the wrongful delay; that is to say, to interest on the value of the cotton for the time lost. British Columbia Sawmill Co. v. Nettleship, L. R. 3 C. P. 499. On the other hand, the Shipper asserts that, in cases similar to the one before us, the true measure of damage is the difference between the market value of the merchandise at its place of destination when it should have been there delivered, and what it will bring in the same market when its delivery is actually made, for which latter sum it claims that the parties by their agreement have substituted what the cotton brought at Savannah.

The leading case in support of the rule for which the Owner contends is doubtless The Parana, L. R. 2 P. D. 118. Lord Justice Mellish in his judgment there stated the reasons in its favor with great force and clearness. The Owner further relies upon The Gentleman, Fed. Cas. No. 5,324, and upon the comparatively recent case of Aktieselskabet Stavangeren v. Hubbard Zemurray S. S. Co., 250 F. 67, 162 C. C. A. 239, which latter, however, does not seem to be specially in point.

While there is much to be said for the Owner's view, it has been, we think, definitely rejected in this country by both state and federal courts. It is not contended that even in England the principle of the Parana could be applied to a tardy delivery by a common carrier by land, as indeed Lord Justice Mellish himself expressly recognized. He thought, however, that transportation

by sea across vast oceans was from its very nature exposed to so many uncertainties that it was not reasonable to believe that Shipper and Carrier, when they entered into their contract of carriage, had any definite time of delivery in mind. Moreover, he thought that the practice of selling goods "afloat" or "to arrive" was so common that the measure of damage applied on land would often be inapplicable. The Parana was decided 47 years ago. It is by no means certain that, even in England, it would now be unhesitatingly followed.

It is true that Mr. Carver, in the sixth edition of his well-known treatise on the Carriage of Goods by Sea, in section 726, says that "the fall in the market is not a consequence of the improper delay, and when it is due to a fluctuation which is not of a periodical, regularly recurrent kind, so that it could not be anticipated as a matter of common expectation, it is not one of those ordinary circumstances by which the carrier's liability may be increased," and he cites in support of the rule thus stated Cave, J., in Hawes v. S. E. Railway Co., 52 L. T. 514, and The Parana, supra, but he significantly adds, "But no hard and fast rule can be laid down," and he then quotes from the judgment of the Master of the Rolls, speaking for the Court of Appeal in the much more recent case of Dunn v. Bucknill Bros., [1902] 2 K. B. 614, that: "There can be no absolutely peremptory rule taking voyages by sea out of the principles which regulate the measure of damages on breach of other contracts. It is only because the possible length of voyages, and the consequent uncertainty as to time of arrival, may in many cases eliminate the supposition of any reasonable expectation as to the state of the market at the time of arrival, that as a general rule damages for loss of market by late delivery are not recoverable from the carrier by sea. * * * Wherever the circumstances admit of calculation as to the time of arrival and the probable fluctuation of the market being made with some degree of reasonable certainty in the case of a sea as of a land transit, there can be no reason why the damages for late delivery should not be calculated according to the same principle in both cases."

Nearly half a century has elapsed since the decision of The Parana, and more than two decades since that of Dunn v. Bucknill Bros. In the meanwhile steam has more and more taken the place of the shifting winds as the motive power upon the sea,

with the result that the duration of voyages may now be calculated with at least some approach to certainty, even when they are to the ends of the earth. In these days merchants make their calculations accordingly, and it is not unreasonable to insist that shipowners shall do the like. There would seem to be little injustice in so doing, when it is remembered that they are not answerable at all, when they are able to show that the delay was caused by something which due diligence on their part was powerless to prevent.

The uncontradicted evidence in the instant case shows that, in the cotton trade between this country and Japan, the parties deal in reliance upon their experience that a voyage from one country to another will be completed in from 60 to 90 days, in the absence of embargoes, disasters at sea, and such unusual incidents, and that sales "to arrive" or of cotton "afloat" are unusual. It would accordingly seem that upon the record here presented even an English court would sustain the Shipper's claim as to what is the applicable measure of damage. Whether this be true or not, is, however, immaterial, for with the exception of the comparatively early case of The Gentleman, supra, the American courts have always been more inclined than were those of the older country, to apply to ocean carriage the land rule as to the measure of damage for tardy delivery, and there can be no doubt that Mr. Carver, in his Carriage of Goods by Sea, § 726, is correct in saying: "In the United States the rule is laid down generally that the damages for improper delay are measured by the difference between market value at the time when the goods should have arrived and their market value on actual arrival." His conclusion in this matter is sustained, not only by the decision he cites of The Styria, 101 F. 728, 41 C. C. A. 639, but by many other cases as well. The Caledonia (C. C.) 43 F. 681; Id., 157 U. S. 124, 15 S. Ct. 537, 39 L. Ed. 644; City of Para (D. C.) 44 F. 689; The Jeanie, 236 F. 463, 149 C. C. A. 515; Schwarzchild v. National S. S. Co. (D. C.) 74 F. 257; Swift & Co. v. Furness-Withy Co. (D. C.) 87 F. 345; The Prussia (D. C.) 100 F. 484; The Giulio (D. C.) 34 F. 909; The Gutenfels (D. C.) 166 F. 989; The Golden Rule (C. C.) 9 F. 334; Bussey v. Memphis & Little Rock R. R. Co. (C. C.) 13 F. 330.

The evidence shows that, had the cotton left Jacksonville by May 15, it would have reached Kobe somewhere between July 14th

and August 13th, and during that 30-day period, and indeed until August 20, the market price of cotton in Japan was. 50 cents per pound. It follows that, if there had been no delay, the 232,465 pounds of cotton in the 500 bales would have been worth there, at that time, $116,232.50. The net sum received for them when they were resold, after deducting the expense of getting them to market, reconditioning them for sale, and selling them, was $25,925.24. The difference is $90,307.26, which was the Shipper's loss. It is stipulated that of this $11,-890.60 represents the damage resulting from the stranding, and this sum the Shipper has already received from the Underwriter. We shall affirm the decree of the court below, requiring the Owner to pay that amount to the Underwriter. In so doing we are not to be understood as holding that the amount in question could not properly have been awarded to the Shipper. If it had been, the Underwriter would, however, have had the right to demand it from the Shipper, and our affirmance of this part of the decree below is a short cut to the end which must ultimately be reached. If from the Shipper's total loss of $90,307.26 there be deducted the $11,890.60, which it has received from the Underwriter, there will remain a balance of $78,416.66, for which the Shipper is entitled to a decree against the Owner.

We agree with the learned court below that the Shipper and the Underwriter are entitled to interest on the respective sums awarded them at the rate of 4 per centum per annum, and upon the principle by which it fixed the dates from which that interest should run, but our different conclusions as to the time at which the cotton should have arrived in Japan requires that the interest to be paid the Shipper shall be calculated from a different and earlier day than that which was designated in the decree below. The Shipper should have received the cotton, or its value, $116,232.50, not later than August 14, 1920. It actually got nothing until January 15, 1921, and is therefore entitled to interest on that sum for the 5 months' interval between those two dates, or to $1,937.20. On or about January 15, 1921, the proceeds of the resale, amounting to $25,925.24, came into its hand, and the Underwriter paid it $11,890.60. From January 15, 1921, the Shipper will therefore be entitled to interest on the difference, that is, upon the $78,416.66, so that the form of the decree in its favor should be that the Owner

pay to it $78,416.66, plus $1,937.20, or $80,-353.86, with interest at the rate of 4 per centum per annum upon $78,416.66 from January 15, 1921, and that in favor of the Underwriter should require the Owner to pay it $11,890.60, with interest thereon at the same rate from the same day.

The Shipper in the court below laid claim to the reimbursement of certain other expenses incurred by it, and here complains that as to them its prayer was denied. Without further prolonging this already lengthy opinion, it is sufficient to say that we find no error in the conclusion of the District Court in that matter.

It follows that the decree below will be affirmed, except as to the amount to be awarded the Shipper, and as to the date from which the interest on such amount shall run, and, as herein already indicated, it will be as to them modified.

WADDILL, Circuit Judge (concurring in part). The crucial question to be determined in this case in the liability of the government to Teikoku Menkwa Kabushiki Kaisha, a Japanese corporation, for damages sustained by reason of the alleged breach of the contract to transport 500 bales of cotton from the ports of Charleston and Jacksonville, in the United States, to Kobe, Japan, mentioned in the opinion of the majority, and fully set forth in these proceedings. The government relied upon the provisions of the Harter Act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [Comp. St. §§ 8029–8035]), as entitling it to exemption from liability.

The learned judge of the District Court, after giving much consideration to this defense, reached the conclusion that the same, under the circumstances of this case, could not be availed of by the government, because of its failure to exercise the reasonable diligence required of it to furnish a seaworthy vessel, properly manned, equipped, and supplied, before starting on the voyage, and accordingly, after making a certain deduction on acount of insurance money, decreed against it for the sum of $39,-920.45, with interest from January 15, 1921, from which decision this appeal was taken. While I cannot well see that the government could have exercised a higher degree of diligence than it did in its effort to ascertain the seaworthiness of the vessel, still I am inclined to forego my views and accept those of the District Judge, who saw and heard the witnesses, and whose recognized

ability and long experience entitles his judgment to great weight. I therefore concur in his conclusions and assessment of damages.

I am wholly at variance with the majority of the court in increasing the award from the sum of $39,920.45, with interest as above stated, to that of $80,553.66, with interest on $78,416.66 from January 15, 1921. I can but feel that, if the judgment of the District Court denying the exemption from liability under the Harter Act is to be accepted, by like token the damages fixed by that court should be adopted. I do not, of course, doubt the right of this court to increase damages in admiralty cases, but insist that, under the circumstances here, it should not be done. It is only where an error of law has been plainly made, or the award is clearly and manifestly inadequate, that there should be an increase in the same by the appellate court. The Sybil, 4 Wheat. 98, 4 L. Ed. 522; Hobert v. Drogan, 10 Pet. 119, 9 L. Ed. 363; The Camanche, 8 Wall. 448, 19 L. Ed. 397; The Ariadne, 13 Wall. 475, 20 L. Ed. 542; Oelwerke Teutonia v. Erlanger, 248 U. S. 251, 39 S. Ct. 180, 63 L. Ed. 399; The R. R. Rhodes, 82 F. 751, 27 C. C. A. 258; The Kia Ora, 252 F. 507, 164 C. C. A. 423; The Kanawha, 254 F. 762, 166 C. C. A. 208; United States v. Nelson et al. (C. C. A.) 276 F. 706; The Santa Barbara (C. C. A.) 299 F. 152; Merritt & Chapman Derrick & Wrecking Co. v. United States of America (C. C. A.) 3 F.(2d) 381.

This certainly cannot be said to be true in this case, as the District Court's award, in my view, gives the maximum allowance that should be made in any event.