**PENNSYLVANIA R. CO. v. WM. H. MULLER & CO., Inc.**

(Circuit Court of Appeals, Fourth Circuit. October 19. 1926.)

No. 2424.

1. **Appeal and error** ⬅️1039(2)—**Trial court's construction of declaration in suit against railroad, claiming damages for failure to transport wheat within reasonable time, even if erroneous, held harmless, where railroad at trial went fully into question raised thereby.**

Construction of trial court of declaration in suit against railroad for damages for failure to seasonably transport wheat under agreement pursuant to provisions of tariffs governing export grain rates, as claiming damages for failure to transport wheat within reasonable time, even though erroneous, *held* not harmful, where railroad at trial went fully into question of reasonable time of transportation.

2. **Carriers** ⬅️105(1).

Provision in tariffs governing export grain rates that railroad, on expiration of five days after elevation of grain, assumes cost of storage, *held* not to limit measure of damages for unreasonable delay thereto.

3. **Carriers** ⬅️105(1).

Demurrage paid on ocean-going vessels by shipper because of unreasonable delay of railroad in transporting grain for export is proper element of damages.

4. **Appeal and error** ⬅️999(1).

Verdict of jury on questions of fact is conclusive on appeal.

5. **Carriers** ⬅️105(1).

Ordinarily measure of damages for carrier's unjustified delay is difference between market price when goods should have been delivered and market price when they were in fact delivered.

6. **Carriers** ⬅️105(1).

Railroad, agreeing to transport grain for export, is liable on unreasonable delay in transportation for difference in price at which grain was sold for future delivery and market price at destination at time shipper broke its contract to deliver due to railroad's delay.

In Error to the District Court of the United States for the District of Maryland, at Baltimore; Morris A. Soper, Judge.

Suit by Wm. H. Muller & Co., Inc., against the Pennsylvania Railroad Company, originally brought in state court and removed therefrom. Judgment for plaintiff, and defendant brings error. Affirmed.

Ralph Robinson and Shirley Carter, both of Baltimore, Md., for plaintiff in error.

R. E. Lee Marshall, of Baltimore, Md., for defendant in error.

Before WADDILL, ROSE, and PARKER, Circuit Judges.

ROSE, Circuit Judge. W. H. Muller & Co., Inc., the defendant in error, is a New York corporation. It was the plaintiff below. The plaintiff in error, the Pennsylvania Railroad Company, is a body corporate of the state whose name it bears. They will be referred to as the shipper and the railroad, respectively. The suit was originally brought in a state court of Maryland and was removed by the railroad to the court below. The shipper sought to recover the damages it said it had suffered by the failure of the railroad seasonably to carry its wheat from Buffalo to Baltimore. The jury gave it $119,206.64.

The railroad relies upon a score or more of assignments of error. In form these attack various rulings upon evidence and the action of the learned District Judge in giving and refusing instructions. In substance they raise three major questions, one of which has several branches. These are: Was the shipper entitled to recover at all (1) upon the pleadings; (2) upon the merits; and if it was, (3) what was the measure of its damages?

In the light of the verdict of the jury, the facts may be taken to be that, prior to September 9, 1922, the shipper had bought or had arranged to buy 2,000,000 bushels of Manitoba wheat and had planned to have them brought by lake steamers to Buffalo. It intended all of this grain for export. It had already sold some of it c. i. f. various European ports and was in treaty for the sale of more. It had chartered a number of ocean-going steamships to carry this wheat across the Atlantic and purposed to hire others. It preferred to make its shipments from Baltimore, but as, in its charter parties, it had reserved the option of directing

the vessels to report at any one of a number of ports on our Eastern coast, it sought, before giving any of them their orders, to make sure that the railroad would be able to bring the wheat from Buffalo to Baltimore in time to put it upon the ships during their respective lay days.

Accordingly on September 9th, the shipper, in conformity with the established usage of the trade and of the railroad, sought the railroad's representative in Baltimore and told him the situation in which it was, as that has already been described. He was informed of the dates, or of the approximate dates, at which the chartered ships would be entitled to demand their cargoes, and that, if the grain did not arrive in time "to liquidate" the shipper's "contracts," default and consequent liability would follow. The shipper asked to be told if the railroad was not in a position to handle the grain, so that it might in that event order the ships to some other port than Baltimore. The railroad's agent replied that he thought the railroad could do what was required, but that he would have to take up the matter with its headquarters at Philadelphia. This he did at once, and on the 11th of September wrote the shipper that, referring to conversations relative to "your 2,000,000 of bushels of Manitoba wheat to move from Buffalo late September or early October, which you advise will have prompt ocean clearance upon arrival at Baltimore, we will gladly arrange to book this freight upon advice as to lake steamers. Thanking you for the business, we remain," etc.

Thereafter, the shipper ordered five of its chartered ships to Baltimore. Before the time for giving like orders to others, it became apparent that the railroad would not have the wheat for them, and they were put to other uses. From time to time and in due season the shipper furnished the railroad with the names of the lake steamers bringing its grain to Buffalo. On October 4th, the first of the shipper's vessels to arrive at Baltimore reported herself ready to load. The second made a like report on the 11th, the third on the 13th, the fourth on the 18th, and the fifth on the 23d of the same month. More than sufficient wheat to furnish full cargoes for all of them had been brought by the shipper to Buffalo long enough in advance of these dates to have enabled the railroad to have had it in Baltimore ready for the ships as soon as they were prepared to receive it, provided the railroad had moved it from Buffalo to Baltimore with anything like usual dispatch.

As it was however, the railroad did not start the movement from Buffalo of any part of the shipper's wheat until some time in November, and none of it arrived until after all the ships had gone on demurrage, and not sufficient of it reached Baltimore before the end of November to enable the shipper to fill all of its foreign contract of sale for November shipment from a North Atlantic port, upon two of which it consequently defaulted.

### The Pleadings.

The declaration had but one count, which alleged that on September 11, 1922, the shipper had contracted with the railroad to ship its wheat from Buffalo to Baltimore for export to foreign destinations, and that on that date the railroad undertook and agreed to transport and carry the wheat, and to move it from Buffalo late in September or early in October, 1922, and to deliver it at Baltimore for export within a reasonable time from the commencement of the movement. The declaration further charged that such contract and agreement was entered into under and pursuant to the provisions of the then prevailing tariff governing export ex lake grain rates from Buffalo to Baltimore. Appropriate allegation followed to the effect that the shipper had done whatever it was required to do, and that the railroad had wrongfully and unreasonably neglected and refused to furnish necessary cars and equipment, and had wrongfully and unreasonably delayed the movement, transportation, and delivery of the wheat as a result of which it did not arrive in Baltimore in time to load it on board ships there waiting to receive it for transportation and delivery to foreign purchasers. There followed statements of the nature of the damage resulting and allegations that the railroad had been at all times informed of the nature and character of the shipper's obligations, both with respect to the timely shipment of the wheat from Baltimore for the purpose of meeting its engagements with foreign purchasers and with respect to the timely delivery to the ships to avoid liability for demurrage and of the special damages which delay would cause the shipper.

[1] The railroad did not demur to this declaration, but instead pleaded the general issue, but by appropriate prayers for instructions to the jury and by objections to testimony it sought to raise the question of the right of the shipper to recover even if it proved all that it had alleged. The railroad's argument was and is that the shipper seeks

to recover in assumpsit for breach of a contract to furnish cars and transportation within a limited time certain and that the carrier may not validly assume any such obligation. Chicago & Alton R. R. v. Kirby, 225 U. S. 155, 32 S. Ct. 648, 56 L. Ed. 1033, Ann. Cas. 1914A, 501; Davis v. Cornwell, 264 U. S. 560, 44 S. Ct. 410, 68 L. Ed. 848. There may well be a question whether all that was said in those cases has any application to the one at bar.

The allegation of the declaration that the agreement was made in accordance with the provisions of the published tariffs regulating the rates and conditions of the transportation in contemplation is based upon the fact that the tariffs themselves declare that the rates prescribed in them will "apply only when previous arrangements are made with the carriers" "in order to provide for the elevation, storage, insurance and necessary equipment." These tariffs deal with a situation which they describe as "when grain is *contracted* before elevation for immediate shipment and is placed in custody of carriers." Under such circumstances it is declared that the carriers will be responsible for loss by fire and will assume the cost of storage accruing after five days from date of elevation." It is said that, "when such *contracts* are made, the responsibility of the carrier will begin when grain is delivered into the elevator leg." Still another paragraph of these tariffs read: "When grain is *contracted* in the elevator for immediate shipment, the carrier" "will not accept custody until the expiration of five days (Sundays and legal holidays excepted) after date of contract." A fourth paragraph deals with what it describes as "grain *contracted* not for immediate shipment, or *contracted* for immediate shipment, but subsequently ordered held in elevator." The italics are ours.

It is expressly provided that the rates of transportation prescribed in these tariffs apply only to traffic for export to foreign countries. In the cases relied upon by the railroad and already cited the tariffs contained no provisions similar to those herein quoted or summarized. Specifically there was no requirement that in order that the tariffs should apply a "previous arrangement" must have been made with the carriers "in order to provide for the elevation, storage, insurance, and necessary equipment" nor when such arrangements were made did the tariffs refer to them as "contracts." As already noted the tariffs under which the wheat in controversy was to move

applied to grain intended for export and to that alone. Conditions in the export trade differed from those existing in most others. If the equipment of the carrier, such as its cars, terminal tracks, elevators, and so on, were to be used to their best advantage, and if the ocean-going ships were not to be kept idle at their wharves, it was essential that provision must be made in advance that the grain should be at the seaside when the ships were ready for it and that the ships should be at their docks when it reached the water front.

The tariffs with which we are presently concerned were intended to serve the practical needs of the business to which they related. They dealt with the conditions prevailing in it, and did not concern themselves with those of other trades. They required shippers and railroads to enter into a previous arrangement and that arrangement they called a contract. Whether that description was accurate may be left for consideration in some case in which its definite determination may be required, as it is not in the one at bar.

For our present purposes it is enough that the shipper, in order to show that it was entitled to the service, was bound to allege that it had entered with the railroad into the required previous arrangement. It would be hard measure to refuse it any relief to which it would otherwise be entitled merely because it adopted the nomenclature of the tariffs and called that arrangement a contract. It will be noted that the breach alleged was not that the railroad did not make the shipments in late September or early October as by the so-called contract it had agreed to do, but that after such arrangement had been made it had wrongfully and unreasonably neglected and refused to furnish necessary cars and equipment, and had wrongfully and unreasonably delayed the movement, transportation, and delivery of the wheat.

In the actual trial of the case, and in the instructions of the court to the jury, the right of the shipper to recover was conditioned upon its satisfying the jury, not only that the railroad had made the arrangement or contract of September 11, but that it had not shipped the wheat within a reasonable time. The court told the jury that what was a reasonable time depended upon the conditions existing, and that whether the grain was or was not moved within a reasonable time depended upon the railroad's ability to perform its undertaking with reasonable regard for the rights of such other persons

as from the evidence the jury might find were asking for transportation facilities.

On this branch of the case the issue actually submitted to the jury was, not merely whether the railroad had broken its contract, as it was in the cases upon which it now relies, but whether it had also failed to give the shipper the service to which the latter was entitled. The railroad answers that it is immaterial what course the trial actually took. The declaration was in assumpsit and in assumpsit alone. It based the right of recovery upon a breach of contract, and upon nothing else or other, and the railroad says that the cases it has cited hold that upon such a pleading no recovery may be had. As has been already inferentially suggested, it may be open to question whether the construction which the railroad would put upon the declaration is the only one of which it is susceptible. It charged that the railroad had wrongfully and unreasonably neglected and refused to furnish cars and equipment, and had wrongfully and unreasonably delayed the movement, transportation, and delivery of the wheat. Such allegations, standing alone, if sustained by evidence, would have supported recovery, except for the requirement of this particular tariff that a previous arrangement with the carrier must be made.

The learned counsel for the railroad, however, argue that such language, in the connection in which it is used, is too general and ambiguous to change what otherwise would be a declaration in assumpsit for breach of the contract of September 11th into something else. At the present stage of the case, we are not concerned to inquire whether this contention is or is not well founded. The learned District Judge obviously did not agree with it. He told the jury that the shipper was not suing for the absolute failure to bring the grain. It sued and claimed damages for the failure of the railroad to bring it within the time which would enable the plaintiff to comply with its contracts, not only for ocean tonnage, but for the sale of the wheat in the United Kingdom. He added that from that standpoint the issue was as to whether the time within which the railroad shipped the wheat was reasonable.

Had the learned judge thought that the declaration could not be given the meaning he put upon it, he would doubtless have suggested and permitted an amendment clearly raising the issue which he in fact submitted to the jury. The railroad was not surprised by what was actually done. It, as well as the shipper, went fully into the question as to whether it had or had not been unreasonably tardy in supplying the shipper with the transportation which the latter in due form had rightfully demanded.

It follows that no harm was done, even if the construction put by the court below on the declaration was erroneous, which we by no means suggest was the case.

## Upon the Merits, Did the Shipper Make Out a Case to Go to the Jury?

The evidence for the railroad showed that in the fall of 1922 its activities were greatly handicapped by the shopmen's strike, by priority orders of the Interstate Commerce Commission, and by other causes, while its facilities for moving grain were taxed beyond what was usual by the exceptionally large grain crop of Canada and the Northwest. Nevertheless, after making the most liberal allowance for all these conditions, we are persuaded that there was enough testimony to have justified reasonable men in finding, as the jury did find, that the railroad was unreasonably tardy in moving the shipper's grain, and that either by negligence or design it withheld from the shipper the service which was given others in like case.

### The Measure of Damage.

It remains to inquire whether there was harmful error in the instructions given by the court as to the measure of damages the jury might allow the shipper, if they found it was entitled to recover at all. The shipper introduced evidence of what it had paid or had lost as (1) demurrage on the ships it had chartered to carry the wheat across the ocean; (2) for breach of its contracts of sale to European buyers; (3) in consequence of the fluctuations of the dollar value of the British pound during the period of delay; (4) for insurance and storage during the detention of the wheat at Buffalo.

[2] The railroad says that the last named is in any event all for which it can be held liable. It relies upon that provision of the tariffs already mentioned, to the effect that upon the expiration of five days after the elevation of the grain at Buffalo, contracted for immediate shipment, it will be responsible for loss by fire and will assume the cost of storage. It says that such provision is intended to fix and legally fixes the measure of damages to which a shipper whose grain has been unreasonably detained is

limited and that nothing else may be recovered. To our understanding the tariffs do not indicate any such purpose. The provision relied upon does fix definitely the time from which liability for loss by fire and the cost of storage falls upon the carrier, but it does not purport to do anything else or other.

### Demurrage.

[3, 4] The sums which the shipper was compelled to pay for demurrage were the natural and indeed the almost inevitable results of the failure of the railroad in due season to bring the grain to Baltimore. They were of necessity in contemplation of the parties at the time the railroad made with the shipper its arrangement of September 11th, which was expressly based upon the shipper's assurance that it would have ships at Baltimore ready to receive the wheat upon its arrival at that port. All questions of fact concerning the shipper's claims for demurrage were duly submitted to the jury and their verdict upon them is necessarily conclusive here. It may be noted that the amount, something over $28,000, they awarded the shipper on this account shows discrimination on their part. They rejected the $20,000 claim for demurrage upon the Clara Camus, doubtless because that ship was not chartered until September 27th, by which time they may have concluded that the shipper should have known that it was at least doubtful whether the wheat would be in Baltimore in time for the ship. It is true they allowed for demurrage on another vessel, the Fuju Maru, which was not ordered to Baltimore until after the Clara Camus has been directed to that place; but the Fuju Maru had been chartered as early as August 14, and had to be ordered somewhere, and even if, when she was sent to Baltimore, there was small chance of her cargo being ready for her, the jury may well have thought that at that late date the shipper was, through the fault of the railroad and through no omission of its own, powerless to provide a load for her at any other port to which it had the right to tell her to go.

### Damages to Recompense the Shipper for What It Paid for the Enforced Breach of Its Sale Contracts.

The shipper proved that it had sold 520,000 bushels of wheat for shipment in November and for delivery in Europe c. i. f. The failure of the railroad to get the grain to Baltimore in time for shipment in that month compelled the shipper to break its contract. In the meanwhile the price of wheat in Europe had gone up to such an extent that it was there worth more than $90,000 above the figure at which the shipper had promised to deliver it. The loss fell upon it. The jury found that it was entitled to recover this sum from the railroad.

[5, 6] The ordinary measure of damages in a suit against a carrier for unjustified delay in delivery is the difference between the market price when the goods should have been delivered and the market price when they were in fact delivered. See discussion in United States v. Middleton (C. C. A.) 3 F.(2d) 384. That, of course, assumes that the shipper proposed to sell the goods after their arrival, for in that event the usual rule as it has been stated, compensates him for his loss. Under the facts in the instant case, the shipper, having sold the wheat in September for November shipment, stood to lose by a breach in its contract of shipment the amount by which the market price of the grain advanced between the time of the sale and the breach by it of its contract. There was abundant evidence to go to the jury that the railroad was fully informed when it made the arrangement of September 11th, and thereafter when, as the jury found, it was unreasonably delaying the transportation of the wheat, that the shipper had sold the wheat and was to deliver it in Europe. Indeed, the record shows, and we might almost be justified in taking judicial notice, that dealings in grain for export almost universally take that form. We think, therefore, that there was no error in the learned judge below telling the jury that, if they found that such a method of dealing with grain was in contemplation of both the railroad and the shipper, they might allow the latter what from the evidence they found was the difference between the price at which the shipper sold the grain and the market price in Europe at the time it broke its contract, as it was compelled by the delay of the railroad to do.

### Fluctuations in the Dollar Value of the Pound.

When the shipper sold the wheat, as it did, for a price fixed in British currency, it knew what that price would be in dollars if the payment was to be made at the time of the sale. But the payment was not then to be made. It was not due until seven days after sight of draft attached to bill of lad-

ing and other shipping documents. The sales were made in September, one of them as early as the 8th and the shipments need not be made before the last of November. Payment might therefore not become due until some time after the middle of December. At that time, for some years before and for a year or more afterwards, there were marked and rapid fluctuations in the dollar value of the British pound. A shipper on this side paid in dollars for the wheat and for its transportation at least as far as Baltimore. The price offered him in pounds by a prospective British purchaser was attractive to him, or the reverse, as it compared with what those pounds would yield him in dollars. What that yield would be three months later he could not tell, but he could at a trifling cost make sure that he would neither gain nor lose by any change which might take place in the meantime in the relative values of dollars and pounds. At the time he made his contract of sale, he could also sell the pounds which he was to receive under it, those pounds to be delivered by him at the time he was under his contract to receive them from the purchaser of his grain. If he delivered his wheat, and it was duly paid for, he turned over the pounds he received to the banker to whom he had sold them. Looked at in this way, the real nature of selling exchange by a seller of commodities to be subsequently paid for in a foreign currency becomes very simple. If all goes as expected, it is a mere device to insure that the seller will, at the time he sells, make certain of the number of dollars he will get for his goods.

But, in this case, things did not go as they should. Through the fault of the railroad, as the jury has found, the shipper was forced to break its contracts of sale. It therefore received no pounds from the buyer, and it had none to turn over to the banker to whom it had sold them. It had to go into the exchange market and buy pounds for delivery, and, when it had to buy, it took more American dollars to purchase a British pound than it did when the shipper had been a seller of pounds, and the consequence was that its attempt to eliminate the possibility of its losing anything by the fluctuation in the rate of exchange added some $22,000 to its losses.

The learned judge below thought that there was evidence to go to the jury that the practice of thus protecting against the fluctuations of exchange was so well established that it must have been known to the railroad, and was therefore in its con-

templation as one of the things which would necessarily happen. We find no occasion to express any opinion on the question, as from the amount of the jury's verdict it is clear that they allowed the shipper nothing on this score.

### Insurance and Storage at Buffalo.

The instructions of the learned judge below as to the claim of the shipper to recover the amount it paid for insurance and storage at Buffalo appear to be clearly right, but, as the jury allowed nothing for these items, it would have made no difference, had they been otherwise.

It follows that we can discover no prejudicial error in any of the rulings below, and the judgment must be and is affirmed.